[No. 22669. Department Two. March 19, 1931.]

ELSIE BJORKLUND, *Respondent,* v. CONTINENTAL
CASUALTY COMPANY *et al., Appellants.*[1]

[1]Reported in 297 Pac. 155.

*Rummens & Griffin,* for appellant Continental Casualty Co.

*Crawford E. White,* for appellant Thompson.

*Meyers & Couden* and *Chas. W. Johnson,* for respondent.

MILLARD, J.—The wife of insured, as beneficiary, brought this action to reform a policy of accident insurance, and to recover on the insurance contract as reformed. Acceptance of a policy which provided for the payment of four hundred dollars was induced, plaintiff alleged, by the fraudulent misrepresentations of the insurer's agent that the amount payable under that policy was three thousand dollars. The trial of the cause to the court resulted in a decree reforming the policy so as to provide for the payment of three thousand dollars to the beneficiary. From judgment against the insurance company and its agent, and each of them, the defendants have appealed.

Appellants contend that the demurrer to the complaint should have been sustained as respondent did not plead—and that the action should have been dismissed as the respondent did not prove—that the insured lost his life in consequence of a peril insured against under the provisions of the policy. It is insisted that the allegation (the only one made by respondent as to the cause of the death of the insured),

"That said Einar Bjorklund was killed in an accident on May 26, 1925, in the city of Seattle, state of Washington; that said Einar Bjorklund was pulled into a marble compressor on which he was working and which was unguarded."

does not bring the cause of death within the terms of the policy:

" . . . resulting exclusively from a bodily injury which is effected solely by external, violent and purely accidental means."

The policy, which was incorporated in and made a part of the complaint, provides:

"Hereby insures Einar Thorvald Bjorklund . . . and promises to pay to him or his beneficiary, Elsie Bjorklund, his wife, indemnity for loss resulting from accident or sickness, all to the extent hereinafter provided . . . and its indemnities are the principal sum of Four Hundred Dollars, and Accident Indemnity at the rate of fifty-five dollars per month, . . . .

"The insurance given by this policy is against (1) loss of life (suicide not included), limb, limbs, sight or time *resulting exclusively from a bodily injury which is effected solely by external, violent and purely accidental means* and which causes at once and continuously after the accident, total inability on the part of the insured to engage in any labor or occupation. . . .

"PART VI NOT COVERED.

"This policy does not cover any loss caused by or resulting in whole or in part from (1) injury received . . . while engaged in aeronautics, or while insane, or while under the influence of any intoxicant; (2) Injury sustained by the insured by reason of voluntary exposure to unnecessary danger or by reason of the intentional act of any person, assaults committed upon him for the sole purpose of burglary or robbery excepted; . . ." (Italics are ours.)

The appellant company insured Bjorklund only against death or injury "resulting exclusively from bodily injury which is effected solely by external, violent and purely accidental means." The word "means" is employed in the same sense as the word "cause." It was incumbent upon the respondent to allege that the death of the insured was due to accidental means or "cause" as specified in the policy. She alleged that her husband was killed in an accident by being "pulled into a marble compresser on which he was working, and which was unguarded."

■ A complaint will be liberally construed on demurrer as required by the statute.

"In the construction of a pleading, for the purpose of determining its effect, its allegations shall be liberally construed, with a view to substantial justice between the parties." Rem. Comp. Stat., § 285.

That is to say, the complaint is sufficient as against the demurrer, if a cause of action can be reasonably inferred from the averments of the complaint. Did the complaint allege facts from which it appears that the death of the insured was due to external, violent, and purely accidental means? One, upon reading the allegation, visualizes a person working on a marble compresser, a machine, into which the workman was pulled, or into which he fell, and from which he emerged a corpse, having been crushed to death. There is no presumption that the insured wilfully injured himself, neither is there a presumption that some one wantonly injured him. The cause of the death of the insured was sufficiently alleged. The inference necessarily drawn from the allegation, and the presumption arising thereon, point to the death of the insured by external, violent and purely accidental means.

"It is never presumed that one wilfully and purposely injures himself, or that another has wantonly or wilfully injured him. It would seem that, these marks of violent injury being shown to exist, a proper inference to draw would be that they were caused by 'external, violent and accidental means,' as provided in the policy." *Carpenter v. Pacific Mutual Life Ins. Co.,* 145 Wash. 679, 261 Pac. 792.

See, also, *Guaranty Trust Co. v. Continental Life Ins. Co.,* 159 Wash. 683, 294 Pac. 585.

■ The only testimony as to the cause of the death of the insured was that of the employer of the deceased:

"Q. And he was killed while he was in your plant? A. Yes, sir. He was at the West Waterway Plant. THE COURT: He was killed where? A. At the West Waterway plant. . . . Q. How was he killed, Mr. Soderberg? A. He got into a compressor belt and he was there—I think he was looking at the compressor and the belt caught him. He went in over on the other side of the belt, in the corner, and we don't know yet how it happened."

Appellants argue that the burden was upon the respondent of proving, not only that the death of the insured resulted "exclusively from bodily injury which is effected solely by external, violent and purely accidental means," but that the burden was also imposed upon the respondent of proving that the death of the insured did not result from "injuries sustained by the insured by reason of voluntary exposure to unnecessary danger."

The burden of proof was on the respondent to show that the death of the insured was due to accidental means as specified in the policy. That the insured was killed by being drawn into a belt of a machine, a marble compressor, clearly appears from the testimony. The immediate cause of death is indisputable. A *prima facie* showing was made that the death of the insured resulted from a bodily injury effected solely by external, violent and purely accidental means. The logical inference to be drawn from the circumstances to which the witness testified, and the presumption arising thereon, point unerringly, clearly, to an injury that resulted in the death of the insured within the terms of the policy indemnifying him or his beneficiary.

"In *Meadows v. Pacific Mutual Life Ins. Co.*, 129 Mo. 76, 31 S. W. 578, 50 Am. St. 427, it was shown that the deceased left the depot for the purpose of boarding a freight train standing in another part of the railroad yard. Shortly thereafter his mangled body was found on the railroad track, indicating that he had

been run over by a moving train. It was contended that there was no evidence tending to show that the death was accidental, or was not the result of his own negligence, the insurance company offering many theories by which the death could be accounted for, which would bar recovery under the conditions of the policy. From a well reasoned opinion in which many authorities are collated, we quote the following:

" 'The plaintiff showed beyond controversy that Daniel Meadows died of violent injuries, which were plainly visible upon his body; that the nature of these injuries left no doubt that they were the sole cause of his death and proper proofs were made. Here he rested. He had made a *prima facie* case, unless we are required to presume that because he was killed by being run over by cars on a railroad track, he was voluntarily exposing himself to unnecessary dangers and was violating his agreement in regard to being upon a roadbed of a railroad, within the meaning of the policy.

" 'Such a presumption would destroy the presumption indulged in by the law that Meadows was at the time exercising proper care for his safety. In the absence of all evidence to the contrary the law presumes that he was exercising due care for his protection. There is not a word of evidence tending to show he was intoxicated, or that he was robbed and murdered. He was a man of the full age of discretion and of business habits. Under such circumstances, the language of Judge Agnew in *Allen v. Willard*, 57 Pa. St. 374, is very pertinent. He says: "The natural instinct which leads men in their sober senses to avoid injury and preserve life, is an element of evidence. In all questions touching the conduct of men, motives, feeling and natural instincts are allowed to have their weight, and to constitute evidence for the consideration of courts and juries." '

"In 1 C. J. 495, the learned author of the text states the rule as follows:

" 'The fact of death does not of itself create any presumption that it was the result of an accident; and where in order to make out plaintiff's case, it is necessary to base a presumption that death resulted from

an injury on a presumption that the insured sustained an accidental injury, no recovery can be had. Where, however, it is apparent that the injury to or death of the insured was the result of external and violent means, the issue is as to whether it was due to an accident, within the meaning of the policy, or to some cause excepted by the policy, the presumption is in favor of the accident and against the existence of facts bringing the case within any of the exceptions of the policy, such as insanity of the insured, intentional injury inflicted by a third person, lack of due care and diligence, self-inflicted injuries, and suicide. These presumptions may, however, be overcome by facts and circumstances establishing the contrary.' '' *Buckley v. Massachusetts Bonding & Ins. Co.,* 113 Wash. 13, 192 Pac. 924.

The contention of appellants that the burden is imposed upon the insured, or the beneficiary, of proving that, in an action on an accident insurance policy, the accident happened by reason of something that was not excepted from the provisions of the policy, is contrary to the rule in this jurisdiction. The policy in question does not cover any loss caused by ''injuries sustained by the insured by reason of voluntary exposure to unnecessary danger or by reason of the intentional act of any person, . . .'' The burden rests on the insurer to show that the injury or death was caused by some act which is made an exception to the risk in the policy.

''This instruction tells the jury that the burden is on the defendant to prove the affirmative defense of change of occupation by the insured to a more hazardous one, and that the risks of such changed occupation were the proximate cause of his death. The instruction is correct.

''In *Starr v. Aetna Life Ins. Co.,* 41 Wash. 199, 83 Pac 113, 4 L. R. A. (N. S.) 636, the rule is stated:

'' 'Almost universal authority imposed upon the insurance company the burden of establishing the fact,

in an action on an accident insurance policy, that the accident happened by reason of something that was excepted from the provisions of the policy; and that the burden is not imposed upon the insured to affirmatively show that the accident did not occur by reason of any or all of the exceptions incorporated in the policy.

" '. . . The burden of proof is on the plaintiff to show that the injury or death was due to accidental or other means specified in the policy. . . . The burden rests on the defendant to show that the policy has been avoided by reason of a breach of some conditions precedent, or that the injury or death was caused by some act which is made an exception to the risk in the policy, or that the action was not brought within the time required by the policy.' " *Wallin v. Massachusetts Bonding & Ins. Co.*, 152 Wash. 272, 277 Pac. 999.

■ Appellants finally contend that the proof is insufficient to support the decree of reformation.

The testimony is conflicting as to the conversation between appellant Thompson (agent of appellant insurer), the insured, and respondent. Thompson called at the home of the Bjorklunds the evening of July 21, 1924. Respondent, a lady visitor who was present at the time, and respondent's nine or ten year old daughter testified that Thompson was at that time told by Mr. Bjorklund that "they wanted nothing less than a twenty-five hundred dollar policy." The agent informed them that he could supply a policy that would pay three thousand dollars in the event of death by accident and fifty-five dollars a month for the remainder of the life of the insured in the event of the loss of an arm or leg; that he could not write a policy for twenty-five hundred dollars. The application was then written by the agent and signed by the insured.

The policy was delivered the next day. Respondent and her husband started to read the policy, whereupon the agent stopped them, informing them that they

would not understand it; that it was the agent's job to tell people what the policies meant. Respondent noticed that the policy provided for an indemnity of four hundred dollars. She at once called attention of Thompson to the fact that the policy provided for payment of four hundred dollars when it was understood the indemnity was to be three thousand dollars. The agent explained to them that the twenty-five hundred dollars which the policy provides is payable in case of death in an automobile accident, was payable in case of any kind of accident; that that amount, added to the four hundred dollars appearing on the face of the policy, would amount to three thousand dollars if certain accumulations were included.

While respondent alleged in her complaint that she paid to the agent twenty-seven dollars, which was the correct sum payable on a policy such as was issued, she testified that she paid to the agent forty-two dollars; that the agent explained that the extra fifteen dollars constituted his commission. The policy was delivered July 22, 1924, to the insured, who was killed May 26, 1925. The respondent testified that the policy was not examined by them the ten months it was in their possession, as they were induced to refrain from reading the policy because of the insistence of the agent that they would not understand the policy.

Appellant Thompson denied that he was paid more than twenty-seven dollars, or that he made the alleged misrepresentations, and also disputed the statement that he advised the respondent and her husband not to read the policy. He testified that he fully explained to them the terms of the policy; that at the time the application was signed by the insured the Bjorklunds emphasized the fact that what they desired in the matter of protection was the monthly indemnity feature; that if they were assured of fifty-five dollars

monthly in case of injury to the husband, they would be satisfied, as they would also receive compensation under the workmen's industrial insurance act.

Respondent's daughter, who was not more than nine or ten years old when the policy was issued, corroborated her mother in every detail, even to the precise words that her mother stated the agent employed in explaining the insurance proposition to them, as well as the exact language used by her mother and father in interrogating and answering the agent at the time the application was made and at the time the policy was delivered. The daughter testified that the family had concluded the evening meal when Mr. Thompson called July 21, 1924; that she heard all the representations to which her mother testified and that she then went skating with a friend; that probably thirty minutes later she returned to the house for a skate key and while lingering there she heard the other representations that her mother testified the agent made; she then departed for more skating.

This little girl then remembered that the following night, when the policy was delivered, the agent again made representations as narrated by her mother, and that the agent insisted that the Bjorklunds refrain from reading the policy. Doubtless this child so often heard her mother's recital, during the four and one-half years subsequent to the death of the insured, of what the facts were, or what the mother thought the facts were, that the child became convinced that she heard the two conversations between her father, mother, and the agent relating to insurance.

As opposed to these interested witnesses is the testimony of a fellow-workman of the deceased. He testified that Thompson talked to him and Bjorklund in July, 1924, concerning insurance; that a pamphlet describing the insurance benefits, etc., was given to

him and one was handed to Bjorklund; that Thompson informed them that the twenty-five hundred dollars payable under the policy was for death in a traffic accident; that they arranged to later meet Thompson, who called at the boarding house of this witness, Rudin, that night. Rudin purchased a policy which paid one hundred dollars monthly for disability, for which he paid a premium of forty-eight dollars. Bjorklund informed Rudin that the next day he would take out a policy. The next night, Bjorklund made application to Thompson for a policy. Some time later, Bjorklund told Rudin that he had a policy, but that the payments thereunder were smaller than the one issued to Rudin, as he had not paid as large a premium as that paid by Rudin. The testimony of Rudin was as follows:

"I got that until I went back to work—so long as I was laid up. I was to get $100 per month under my policy. I understood the way Thompson explained it to me that I didn't get that much if I got killed in my work; that I would get $2,500 if killed in a traffic accident. I only knew what Bjorklund told me about his policy. He told me it was not as high as mine because he didn't pay as much, but it was going to be a policy something like mine."

Respondent seeks to reform a written contract of insurance on the ground of fraud. The rules of law governing the reformation of written agreements are applicable to the reformation of an insurance policy.

"An insurance contract is no different from any other when the rules of law governing the reformation of written agreements are to be applied to it. Like other written instruments, a policy or other written contract of insurance is subject to reformation by a court of equity in a proper case so as to make it conform to the actual agreement of the parties. And this is true even after a loss. To justify a reformation, a proper case therefor must be presented, that is, it is necessary and sufficient that it appear, by appropriate

and sufficient pleadings and proof, that a valid agreement exists and that, by reason of fraud or mistake, or, more properly speaking, mutual mistake of the parties or a mistake on the part of one and fraud on the part of the other, . . . the policy . . . fails to express, or conform to, the real agreement." 32 C. J., p. 1140, § 247.

Fraud as a ground for the reformation of a contract will not be presumed or conjectured. Fraud alleged as a ground for the reformation of a contract is not sustained by a mere preponderance of the evidence.

"We are not at liberty, however, to infer fraud merely because it is suggested. Neither can it be found upon a bare preponderance of the evidence." *German-American Mercantile Bank v. Illinois Surety Co.,* 99 Wash. 9, 168 Pac. 772.

"It is settled law that fraud, when it is charged, must be established by evidence which is clear and convincing." *Leibold v. Grosenbaugh,* 126 Wash. 502, 218 Pac. 258.

"Again, the proof of all essential facts must be clear, for if a doubt exists as to what statements the applicant actually made, or as to the intent of the parties, or if the evidence be materially conflicting, a reformation will not be granted." 6 Couch, Cyclopedia of Insurance Law, p. 4993, § 1392.

Applying those rules to the facts in the case at bar, it is manifest that the evidence is insufficient to sustain the decree of reformation.

The respondent is not an ignorant woman. The policy is written in English in large type, easily read. She testified that she, at a glance, saw that the policy was incorrect, in that the amount of indemnity stated on the face of the policy was four hundred dollars when it should have been three thousand dollars. The policy was in the possession of the Bjorklund family for ten months prior to the death of the insured. True, more witnesses testified on behalf of the respondent than

for the appellants, yet the weight of the evidence does not necessarily mean a greater number of witnesses.

"The quality of the testimony given, as well as the number of witnesses produced, and any facts affecting their credibility, must be considered, . . . " 27 C. J., p. 65, § 199.

The only preponderance supporting the decree is that a greater number of witnesses testified in behalf of respondent. Two of the witnesses, respondent and her daughter, were interested witnesses. Appellant, Thompson, on the other side, was an interested witness. We will assume that the lady friend of respondent was a disinterested witness. Her testimony is, at least, balanced, if not overcome, by that of the disinterested witness, Rudin, a fellow-workman of the insured, who testified that he and Bjorklund were insured at the same time; that Bjorklund fully understood, and so stated, the terms of the policy. Clearly, there is not even a bare preponderance of the evidence sustaining the decree of reformation on the ground of fraud.

The evidence was sufficient to sustain the verdict of the jury that the death of the insured resulted from bodily injury effected solely by external, violent and purely accidental means. It follows that the judgment should be reversed, and the cause remanded with direction to enter judgment in favor of the respondent for four hundred dollars, the amount payable under the policy. It is so ordered.

TOLMAN, C. J., BEELER, FULLERTON, and BEALS, JJ., concur.