[No. 25898. Department One. May 4, 1936.]

MARY HILL, *Respondent,* v. GREAT NORTHERN LIFE INSURANCE COMPANY, *Appellant.*[1]

[1]Reported in 57 P. (2d) 405.

168

*Velikanje & Velikanje* and *Clark &, Grady*, for appellant.

*Longfellow & Fitzpatrick* and *H. A. LaBerge*, for respondent.

STEINERT, J.—Plaintiff, Mary Hill, brought this action against defendant, Great Northern Life Insurance Company, to recover the death benefit provided in a special coverage accident insurance policy issued by defendant to plaintiff's husband in his lifetime. Trial before the court and jury resulted in a verdict for plaintiff. Judgment having been entered on the verdict, defendant appealed.

The policy insured William A. Hill, the husband, against loss of life, limb, sight, or time resulting from injury in the manner and to the extent provided in the contract of insurance.

One of the "general provisions" of the policy defined "injury" as follows:

" 'Injury' as used in this policy means bodily injury which is the sole cause of the loss, and which is effected directly and exclusively of all other causes through external, violent and purely accidental means while this policy is in force and which shall, from the date of the accident, wholly, necessarily and continuously disable the Insured from doing any act or thing pertaining to any profession, business, or employment."

Another paragraph of the "general provisions," so far as it need be noticed here, reads as follows:

"This policy does not cover: . . . injuries fatal or non-fatal, of which there shall be no visible contusion, wound, or other marks or evidence of injury on the exterior of the body at the place of injury . . . the body itself in case of death not to be deemed such . . . nor does it cover death, disability or loss caused or contributed to directly or indirectly by . . . any pre-existing disease, infirmity, deformity or physical impairment, . . ."

The issues in this case center about these two provisions.

Mr. Hill, a man about fifty-six years of age, was a salesman of novelties and drug sundries. Upon the

occasion with which we are here concerned, he was driving a sedan car in a southerly direction along south First street, in Yakima. The rear seat of the car was well filled with packages containing merchandise. South First street and south Third street come together at an angle in the southerly portion of the city. Within the angle is a filling station, and in the vicinity are residences and business establishments.

Mr. Hill approached the intersection at a slow rate of speed and then turned to his left in front of the filling station as if he intended to return to the main portion of Yakima by way of south Third street.

An automobile coming from a southerly direction, and driven by one J. J. Linker, collided with Mr. Hill's car while it was making the turn. There is a conflict in the evidence as to the violence of the collision, but, considering the evidence in the light most favorable to respondent, the jury could well have found that the impact raised the left rear wheel of Mr. Hill's car a foot off the ground, mashed the fender down against the tire, and damaged the wheel to such an extent as to require its replacement by another wheel before the car could be driven back to Mr. Hill's home in Seattle; also, that the crash could be heard at some distance by residents living in the vicinity of the accident.

After the collision, both cars came to a momentary stop and then proceeded under their own power to the side of the road, out of the way of traffic. Mr. Linker walked over to the car in which Mr. Hill was then still sitting and began to upbraid him for the accident, Linker's remarks indicating that he would insist on being paid for the damages to his car. Mr. Hill appeared to be in great physical distress. Perspiration stood out upon his face, and other evidences indicated that he was suffering intense pain. He

complained of being sick and asked that he be indulged a little time before discussing the matter. Mr. Linker then sat down on the running board of Mr. Hill's car and waited.

After twenty-five or thirty minutes, Mr. Hill laboriously got out of his car, evidently intending to go around it for the purpose of determining the extent of the damages to the respective cars. He had proceeded only a few steps, however, when he collapsed. His face became red, then turned purplish, and in a few minutes he expired. It later developed from an autopsy that he had suffered an extensive brain hemorrhage. The blood-clot that was removed was about as large as one's thumb. The preponderance of the evidence was to the effect, however, that there were no contusions or abrasions made on Mr. Hill's head or face, although there was some evidence that there was a red mark over his left temple.

It further appears from the evidence that, a few days before the accident, Mr. Hill had consulted a physician in Seattle with reference to his physical condition. A complete examination was not made at that time, owing to the fact that Mr. Hill was anxious to make the contemplated trip. A partial examination, according to the doctor's findings, however, indicated a low blood pressure, a probable coronary pathology, a peptic ulcer, and a definite mitral valve heart murmur. The doctor considered Mr. Hill's condition serious and warned him against any undue strain or excitement. He also prescribed a diet and recommended that a complete examination be made after Mr. Hill's return from the trip. The doctor conceded in his testimony that his preliminary diagnosis was but a presumption from the patient's symptoms, and that it would be impossible to tell whether or not there was a true coronary trouble without a

complete examination, which, concededly, was never made by him.

From the statement of the case as we have outlined it, it is not difficult to forecast the respective contentions of the parties concerning the cause of death. It is the theory of the respondent that the impact between the two automobiles caused a brain hemorrhage resulting in Mr. Hill's death thirty minutes later. The appellant, on the other hand, contends that there was no causal connection whatever between the collision and the brain hemorrhage, but that, just before the collision, Mr. Hill had sustained a severe heart attack from which he partially recovered, and that, when he left his car after the collision, he suffered a stroke of apoplexy due partly to the excitement engendered by Mr. Linker's antagonistic attitude and partly to the exertion of getting out of the car in his then weakened physical condition. In the very nature of things, the issue of fact rested almost wholly upon the conclusions to be drawn from the medical testimony.

Appellant makes a number of assignments of error, which we shall consider in what we think is their natural order. So considered, the first assignment of error goes to instruction No. 6, in which the court told the jury, in effect, that, while the policy did not cover an injury in which there was no visible contusion, wound, or other mark or evidence of injury on the exterior of the body, yet it did not necessarily follow that the injury must be external; that the visible signs and evidence might be such as indicated an internal injury; and that, if the deceased became pale, sickly-looking, showed signs of injury through perspiration or discoloration of his face at the time of, or immediately after, the collision, then the jury might

find that there were visible marks or evidences of injury, within the meaning of the terms of the policy.

The words, ''visible mark or evidence of injury,'' and similar expressions used in accident insurance policies such as we have here, are not construed in the strict and narrow sense of a bruise, contusion, laceration, or fracture, but in the broad sense of something that is discernible, perceptible or evident upon observation. 6 Couch on Insurance, § 1265. This is the general rule and the rule that is followed in this state. In *Horsfall v. Pacific Mutual Life Ins. Co.*, 32 Wash. 132, 72 Pac. 1028, 98 Am. St. 846, 63 L. R. A. 425, where the identical question was presented, this court said:

''It is also urged that the injuries causing death left no visible external mark, produced at the time of and by the accident, upon the body of deceased, and therefore the injury was one excepted from the policy. The evidence as stated above shows that immediately after the accident the deceased became deathly pale and sick, his hands and feet became cold, and the perspiration stood out on his face and hands. The next day after the accident his skin, which previously had been ruddy, became a bluish gray color, and remained so until his death. These, we think, were visible external marks, and sufficient to bring the case within the terms of the policy. (Citing authorities.)''

See, also, *Feis v. United States Ins. Co.*, 112 Neb. 777, 201 N. W. 558, annotated in 39 A. L. R. 1011. There was no error in giving the instruction.

The next assignment of error goes to instruction No. 3½, in which the court told the jury that the burden of proof was upon the defendant, in order to avoid liability under the policy, to prove by a preponderance of the evidence that there was no visible contusion, wound, or other mark or evidence of injury on the exterior of the body at the place of the injury.

In an action upon an accident insurance policy, the burden which the injured plaintiff assumes is to show that injury or death was due to accidental or other means specified in the policy. But on the defendant insurer rests the duty to show that the injury or death was caused by some act which is made an exception to the risk in the policy, or that the policy has been avoided by reason of a breach of some condition precedent, or that the action was not brought within the time required by the policy. *Starr v. Aetna Life Ins. Co.*, 41 Wash. 199, 83 Pac. 113, 4 L. R. A. (N. S.) 636; *Wallin v. Massachusetts Bonding & Ins. Co.*, 152 Wash. 272, 277 Pac. 999; *Bjorklund v. Continental Casualty Co.*, 161 Wash. 340, 297 Pac. 155; *Selover v. Aetna Life Ins. Co.*, 180 Wash. 236, 38 P. (2d) 1059.

Whether respondent sustained the burden of proof resting upon her, to show that death was due to accidental means—in this case through a collision resulting in hemorrhage of the brain—is considered in another portion of this opinion. So far as the instruction under consideration is concerned, it announced the correct rule of law, under the existent facts.

The next assignment of error pertains to the overruling of objections to certain questions. About a week before the trial, the deposition of Dr. Sam C. Standard, the physician who had examined Mr. Hill shortly before his death, was taken. In the deposition, a hypothetical question was propounded which included the assumption of certain facts that were not strictly borne out by the subsequent evidence at the trial. The question assumed that the impact of the collision had caused Mr. Hill's car to turn around, that the packages in his car had been upset by the collision, and that, after the collision, Mr. Hill immediately got out of the car and then collapsed.

It may be conceded that the hypothetical question

was not sufficiently supported by the subsequent evidence adduced on the subject. But it is apparent from the record that the question and the answer thereto had no effect on the particular issue as actually tried. It was conceded by both parties that Mr. Hill's car, when struck, came to a momentary stop, and then proceeded on to the side of the road; also, that Mr. Hill did not get out of the car immediately, but remained in it quietly for about thirty minutes and later, after getting out of the car, collapsed. There was some evidence, though not very much, tending to show that the packages in the rear seat of Mr. Hill's car had become upset by the collision. In view of the fact that, at the trial, there was no apparent conflict in the evidence as to the actual facts in connection with any of the matters just recited, and in view of the fact that Dr. Standard's testimony was taken by deposition prior to the trial, we are convinced that the inaccuracies contained in the hypothetical question were of no moment, and that the jury considered the deposition in the light of the established facts.

Two other questions followed the hypothetical question and were objected to. The objections are only cursorily presented in the brief and, in our opinion, are without merit. We think that they were properly overruled.

The next assignment of error relates also to the overruling of objections to certain questions. This assignment has to do with the testimony of the coroner, a physician who assisted in performing the autopsy. The facts concerning Mr. Hill's death had been disclosed to him prior to the time that the autopsy was held. He was asked at the trial what had caused the hemorrhage, and his answer was that he did not know. He was then asked if a shock caused by an automobile collision would cause it. His answer

was, "It could cause it." We see no objection to the questions, and, if there was any, certainly the answers relieved it. There can be little doubt, under the evidence, that the shock of the collision *could* have caused the hemorrhage, and that is all that the answer purported to convey.

After further interrogation, the same witness was asked what, *in his opinion,* caused the hemorrhage, and his answer was: "Probably from an accident." Exception to the question was made on the ground that the witness did not have sufficient knowledge on which to base an opinion.

Prior to the asking of the question, the witness had been advised of the physical examination and findings by Dr. Standard. After giving his opinion that the coronary trouble and peptic ulcer had nothing to do with the cerebral hemorrhage, the witness testified that, upon the facts known to him, it was his opinion that the hemorrhage was caused by shock resulting "probably from an accident." We think that the question was, under the circumstances, proper, and that the witness was competent to testify thereto. While the answer would probably not of itself be sufficient to sustain the verdict in the absence of more definite testimony on the subject, the jury was nevertheless entitled to consider it in connection with all the other evidence.

The final assignments of error are grouped together and present the question whether the evidence as a whole was sufficient to sustain the verdict and judgment. This, in our opinion, is the most important question in the case.

It is undoubtedly true that, in determining the cause of a death for which recovery is sought, the jury may not speculate or conjecture as between several causes. That is to say, where the evidence goes no fur-

ther than to show that death may have resulted from one of several causes, for one or more of which there is liability, and for another or others of which there is none, then the jury cannot speculate or conjecture and return a verdict as for a cause for which there is liability. But if, under the evidence, accompanied by proper instructions, the jury can, and by its verdict does, find that the death is attributable to a cause for which there is liability, then the verdict does not rest upon surmise or conjecture.

■ The issues in this case were of such a nature that the jury was necessarily dependent upon medical testimony in determining the cause of death. The effects upon the human system of diseases and afflictions such as were portrayed in this case are not within the sphere of common knowledge. To arrive at an intelligent understanding and decision of such matters, the testimony of witnesses possessing special knowledge and skill is required. *O'Meara v. Columbian Nat. Life Ins. Co.,* 119 Conn. 641, 178 Atl. 357. Both parties in the case at bar recognized that fact, and all the testimony as to the producing cause of death came from physicians.

Before referring to the particular evidence, we shall advert to the rule to be applied to its consideration. There are, generally, two classes of cases in which expert testimony as to the facts is admissible. In one class, the facts are to be stated by expert witnesses, but the conclusions therefrom are to be drawn by the jury. In the other class, the expert witnesses not only state the facts, but also give their conclusions in the form of opinions, which the jury may either accept or reject. The first class comprises those instances where the existence of particular facts is not of common knowledge, but is peculiarly within the knowledge of men whose experience or study enables them to

speak with authority. If, with such facts before it, the jury is able to form a conclusion therefrom, it is the sole province of the jury to do so. The other class comprises those cases where not only the knowledge of the facts, but also the conclusions to be drawn therefrom, depend on professional and scientific knowledge or skill. In such cases, qualified experts may testify both as to the facts and as to the conclusions. 11 R. C. L. 573.

The case before us falls within the second classification. Mr. Hill's physical condition at, and before, the time of the accident involved matters of medical diagnosis and required the medium of expert opinion. But just as important were the conclusions to be drawn from the facts, and the conclusions, likewise, required translation by expert professional knowledge.

The particular issue in this case involved the conclusions to be drawn distributively from the effects of possible heart trouble and peptic ulcer, and from a demonstrated cerebral hemorrhage, as bearing, respectively, on the cause of death.

Dr. West, a physician of thirty-two years' experience, whose qualifications were conceded, testified that, in his opinion, after reviewing and considering all the factors included in Dr. Standard's findings and in the report of the autopsy, the death was caused by a cerebral hemorrhage resulting from the shock of collision, and that neither the coronary trouble nor the peptic ulcer had anything to do with the result. He gave, at length, the reasons for his opinion, but it is unnecessary to relate them here.

On the other hand, another physician, called by the defense, testified that, in his opinion, the cerebral hemorrhage did not occur until after Mr. Hill got out of his car thirty minutes after the collision, and that

death was then almost instantaneous. He further testified that, in his opinion, the death was the result of a heart attack. His reasons, likewise, were given at length.

The question, then, was whether death resulted from cerebral hemorrhage induced by shock resulting from the accident, or whether it resulted from coronary trouble. The testimony was clear-cut and conflicting. Under all the evidence, it became a question for the jury to decide. The jury's verdict reflected its version of the cause of death. Whether the one, or the other, of the physicians was correct in his conclusions, is not for us to determine. Had the verdict been the other way, it would have meant that the jury either believed that death was due to coronary trouble, or else that the jury was unable to assign the real cause therefor. But since it found as it did, the only interpretation that can be placed on its verdict is that death was caused by cerebral hemorrhage resulting from the accident. That was a question which the jury had the right to decide and to decide as it did.

The judgment is affirmed.

MILLARD, C. J., MITCHELL, GERAGHTY, and TOLMAN, JJ., concur.