HEADLEE, Respondent, v. NEW YORK LIFE INSURANCE CO., Appellant

(12 N. W.2d 313.)

(File No. 8639. Opinion filed December 16, 1943.)

**Bailey, Voorhees, Woods & Fuller**, and **M. T. Woods**, all of Sioux Falls, for Appellant.

**H. F. Fellows**, of Rapid City, for Respondent.

RUDOLPH, J.. This is an action to recover under the double indemnity provisions of a policy of insurance upon the life of Robert J. Headlee, issued by the defendant, New York Life Insurance Company. The defendant paid the death indemnity and it is only the feature of double indemnity that is involved in this action, which, under the terms of the policy, is to be paid if death resulted from accidental means. Accidental means is defined as death resulting "directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means * * * provided, however, that such Double Indemnity Benefit shall not be payable if the Insured's death resulted, directly or indirectly, from (a) self-destruction, whether sane or insane; * * *".

The facts disclose that Robert Headlee lived with his mother, the plaintiff in this action and the beneficiary named in the policy, on the Headlee Ranch in the south-western part of South Dakota. Robert was a man 24 years old and unmarried. On the evening of March 9, 1942, he was assisting the foreman of the Headlee Ranch, Fred Ball, and his brother, George Headlee, with the necessary evening chores. Fred Ball discovered that a hog had escaped from its pen and directed Robert, the insured, to find the hog and return it to the pen. Robert started on his quest for the hog and this is the last time he was seen alive. A short distance to the rear of the barnyard of the Headlee Ranch there is a creek with rather precipitous banks. The ground was muddy and slippery. Robert started in the general direction of this creek and his body was found approximately a half hour later, partially submerged in the

water of the creek. The brother George discovered the body and thereupon returned to the barn and obtained the help of others in removing the body from the water. Artificial respiration was resorted to and as a result a considerable quantity of water came from Robert's mouth but it was impossible to revive him. The brother George testified that he observed the footprints of Robert leading down the steep bank to the creek at a point approximately where the body was found. The water at this point was approximately 3 to 4 feet deep. The bruises observed on the body of Robert after it was taken from the water were a mark on the nose about as long as a fingernail, a bump about the size of the end of a man's thumb on his forehead and the nose was pushed to one side.

We believe the above statement of facts sufficient for our present purpose. The other facts material to the issues here involved relate to the mental condition of Robert Headlee. It is without dispute in the evidence that for some time prior to his death Robert had been acting queerly and was eventually taken to Rapid City to consult Dr. Dawley, a physician. Robert was taken to the physician by the foreman, Fred Ball. Dr. Dawley testified that after a rather complete examination he could find nothing physically wrong with Robert but that, in his opinion, Robert was not normal. The doctor stated the history which he was able to obtain from Robert and also described Robert's action and demeanor while being examined. The doctor testified: "He acted peculiarly, was difficult to elicit a history from him as to how he did feel or why he had come to me. His answers to questions were very brief and hesitant. He had to be prompted and helped to even answer questions. He didn't sit in his chair and freely and voluntarily describe to me how he felt or why he had come."

The doctor further testified that Robert exhibited signs of shyness and reticence. Robert's mother wrote Dr. Dawley several letters describing Robert's condition. We quote portions of these letters which explain Robert's condition.

"I am Robert Headlee's mother and I'm much con-

cerned about Bob. I know you are going to find out what is wrong and I pray it is nothing serious—of course as a mother I fear—but I have never let Bob know—Bob was always frail when small and for a time we came near not keeping him after a serious case of scarlet fever and mastoid from March until the following November—he snapped out of it and has seemingly been quite well with exceptions of colds. Perhaps Fred told you Bob's father was sick for 40 yrs and due to his condition I think is the cause of Bobs worry afraid he is going insane—Someone started a story that Mr. Headlee was insane before he died but he was not. He had a cancer of Prostate Gland and after he had suffered so long and knew—he—drowned himself."

"Just another hurried note about Bob—I don't know what to say—He don't cry so easily when we talk to him but he sits so lifeless and don't say anything only once in awhile when we talk to him—He was out this A.M. with Fred but when he came in about noon he was tired and is beginning to look as tho he had been sick a long time— Have you heard anything from tests yet—He isn't so flighty as when he was in Rapid he couldn't be still he was up and down constantly now he is quiet—sits—It is hard to get him to lie down. I try to talk to him that he will be alright and I think it helps—this afternoon his face is somewhat flushed—If you find out anything from the tests and its important to act quickly don't wait for mail—sometimes it takes a few days to get mail from Rapid—it goes by or something—I can not help but feel everyday counts—

"I don't know very much about a nervous break down as I have had iron nerves. I had to have—If his is just a case of nerves will medicine help? I told him this A.M. if he would get ahold of those nerves and hold on we would all help him get well—We are trying not to show our anxiety but both Fred and I are rather anxious about him —he looks really sick now—"

"Yesterday morning he got up and went back to bed— so bewildered didn't seem to be able to figure out what he wanted to do— * * * —a neighbor that thinks the world

of Bob came in a few minutes—Bob would smile occasionally say Yes and No—and seemed afraid to talk—after the neighbor left Bob cried and said he was afraid to talk he wasn't sure he would say what he wanted to and he wasn't sure just what he wanted to say. * * * He got up this morning wanted to go to barn with Fred but he couldn't decide how to go about doing it and finally cried it was so pitiful— * * * Robert has always been quite a boy to visit with people usually older people as he has always been with older people, and now he seldom says a word—He said he couldn't tell you how he felt—because he couldn't express himself he didn't know what he would say. * * *"

The trial court submitted the case to a jury which returned a verdict for the plaintiff. Defendant has appealed.

The trial court instructed the jury, first, that the burden of proof was upon the plaintiff to prove that Robert's death resulted solely from accidental means, and second, that the burden of proof was upon the defendant to prove that the death was by self-destruction. We believe this second part of the instruction was error occasioned by a failure to distinguish this action, which is based upon the double indemnity clause of the life insurance policy, from the action in which the insurer in a life policy raises the defense of self-destruction to the regular life indemnity. In the latter type of action death from any cause except self-destruction is insured against; self-destruction is an exception to the liability, and as such must be proved by the insurer. Honrath v. New York Life Ins. Co., 65 S. D. 480, 275 N. W. 258, 112 A. L. R. 1272. In the present action it is only accidental death that is insured against. The burden is upon the plaintiff "to show that the specific condition precedent on which the liability is contingent has taken place", i. e. accidental death. Wigmore on Evidence, 3d Ed., § 2510; New York Life Ins. Co. v. McNeely, 52 Ariz. 181, 79 P.2d 948; Sleeter v. Progressive Assur. Co., 191 Minn. 108, 253 N. W. 531; Grosvenor v. Fidelity & Casualty Co., 102 Neb. 629, 168 N. W. 596; International Travelers Ass'n v. Marshall, 131 Tex. 258, 114 S. W.2d 851; Jefferson Stand-

ard Life Ins. Co. v. Clemmer, 4 Cir., 79 F.2d 724. Since death by self-destruction is not an accidental but an intentional means the evidence must by its purport negative such means. We appreciate that there are cases apparently holding a view contrary to that above expressed. We believe, however, that such contrary view fails to recognize that only death by accident is insured against, and that death by self-destruction or suicide is not an exception to the contractual liability but simply fails to come within the liability created by the contract. Some cases cited in support of the contrary view do not support such view, in that the defenses upon which the insurer relies are exceptions which free the insurer from the liability for which it contracted, for example, where the policy covers only accidental death but excepts therefrom death by accident if occasioned by intoxication, McDermott v. Hawkeye Commercial Men's Ass'n, 158 Iowa 544, 139 N. W. 472; or excepts death as a result of violation of law, California State Life Ins. Co. v. Fuqua et al., 40 Ariz. 148, 10 P.2d 958, or where the insured voluntarily exposes himself to unnecessary danger, Bjorklund v. Continental Casualty Co., 161 Wash. 340, 297 P. 155.

▮ The court further instructed the jury in Instruction VIII that "the legal presumption is that everyone is of sound mind." In the case of Peters v. Lohr et al., 24 S. D. 605, 124 N. W. 853, 855, this court said: "A presumption is not evidence of anything, and only relates to a rule of law as to which party shall first go forward and produce evidence sustaining a matter in issue. A presumption will serve as and in the place of evidence in favor of one party or the other until prima facie evidence has been adduced by the opposite party; but the presumption should never be placed in the scale to be weighed as evidence. The presumption, when the opposite party has produced prima facie evidence, has spent its force and served its purpose, and the party then, in whose favor the presumption operated, must meet his opponent's prima facie evidence with

evidence, and not presumptions. A presumption is not evidence of a fact, but purely a conclusion."

See also Honrath v. New York Life Ins. Co., supra. This concept of the function of the presumption renders it impotent as evidence, when the facts are disclosed, and under such circumstances the presumption is not for the consideration of the jury. As stated by Wigmore on Evidence, 3d Ed., § 2491.

"* * * the peculiar effect of a presumption 'of law' (that is, the real presumption) is merely to invoke a rule of law compelling the jury to reach the conclusion in the absence of evidence to the contrary from the opponent. If the opponent does offer evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule:

"It is therefore a fallacy to attribute (as do some judges) an artificial probative force to a presumption, increasing for the jury the weight of the facts, even when the opponent has come forward with some evidence to the contrary."

Applying the rule as thus established to the facts before us we think it was error to instruct the jury regarding the presumption of sanity. The facts fully disclosed the mental condition of the insured, and it was for the jury to determine this issue upon all the evidence exactly as if no presumption had ever been applicable in the action.

By Instruction IX the court submitted to the jury as having probative value the presumption against suicide. We believe that the same error appears in this instruction as appears in Instruction VIII. Viewing the evidence produced by the defendant we are convinced that it is sufficient to support a finding against accidental death. Clearly this evidence would support a finding that the insured was mentally depressed; the evidence of the footprints leading to the water's edge, the depth of the water in which the body was found, and other details not necessary to mention, point toward self-destruction. A well-considered case treating on this question is the case of

Jefferson Standard Life Ins. Co. v. Clemmer, 4 Cir., 79 F.2d 724, 729. It states:

"* * * the presumption against suicide is not evidence at all, but is a rule of law which in a case of this kind requires the conclusion, in the event of an unexplained death by violent injury, that the death was not suicidal until credible evidence of self-destruction is offered. When such evidence is offered, whether it be in the course of the plaintiff's proof or by the defendant, the presumption as a rule of law disappears from the case and the trier of facts passes upon the issues in the usual way. When unexplained death by violence is shown, a defendant who seeks to avoid liability on the ground of suicide has the burden of going forward with the evidence or the issue of suicide will go against him, but if he offers such evidence, the burden of persuading the jury that death resulted from accident independent of suicide and all other causes remains with the plaintiff, if it rested upon him at the beginning, as in a suit upon an accident insurance policy. This phase of the trial is well described by Professor Wigmore in his formulation of the rules applicable to presumptions, as follows: 'The important thing is that there is now no longer in force any ruling of law by the judge requiring the jury to find according to the presumption. All is then turned into an ordinary question of evidence, and the two or three general facts presupposed in the rule of presumption take their place with the rest, and operate, with their own natural force, as a part of the total mass of probative matter. The main point to observe is that the rule of presumption has vanished; because its function was as a legal rule, to settle the matter only provisionally, and to cast upon the opponent the duty of producing evidence, and this duty and this legal rule he has satisfied.' Wigmore on Evidence, § 2487, vol. 5, p. 445.

"When the case goes to the jury, they are at liberty to take into consideration the abnormality of suicide and to give such probative force, as their judgment dictates, to the fact upon which the presumption is based, that is, in a

case of this sort, to the fact of death by violence; but 'it is not weighed down by any artificial additional probative effect; they may estimate it for just such intrinsic effect as it seems to have under all the circumstances.' * * *

"Ordinarily, it is not necessary to refer to the presumption against suicide in the charge to the jury. If the basic fact of death by violence is admitted, or proved, the presumption arises, and in the absence of countervailing evidence, the judge should direct a verdict for the plaintiff. If such evidence is produced, the judge should charge the jury in the usual fashion. He may of course refer in his discretion to the improbability of suicide as an inference of fact, based on the common experience of mankind, but the jury should be permitted to give the inference such weight as it deems best, undisturbed by the thought that the inference has some sort of artificial probative force which must influence their deliberation. Likewise as to the opposing evidence, the jury should be instructed to weigh its credibility and effect in the usual way, and finally, upon the whole evidence, to determine whether death by accident has occurred, bearing in mind that if the evidence leaves their minds in such doubt that they are unable to decide the point, the verdict should be against the party upon whom the burden of persuasion rests. Such a charge can be easily understood and enables the jury to do justice to both sides. But when the court goes further and introduces the presumption itself as evidence to be considered by the jury, or places the burden on the defendant to satisfy the jury by a preponderance of evidence, he states the principle too strongly and may cause a miscarriage of justice; * * *"

The appellant moved for a directed verdict on the ground of the insufficiency of the evidence. We have concluded that the trial court properly overruled this motion. After carefully considering the evidence in the light of the burden resting upon the plaintiff, and freed from the probative effect attached to the presumptions by the trial judge, we believe the evidence still sufficient to support a finding of accidental death. The insured was apparently out on

a normal mission, looking for a hog escaped from its pen, there had been no previous indication of a desire to take his own life, the insured had suffered some injury to his head and face, as evidenced by the bruises and marks, the ground was icy and slippery and the banks of the creek were precipitous, and other details, the weight of which and the inferences to be drawn therefrom as opposed to the evidence indicating suicide, must be determined by the jury.

The judgment appealed from is reversed.

All the Judges concur.