[No. 29258.   Department One.   July 19, 1944.]

GEORGIA E. CROWELL, *Respondent,* v. SUNSET CASUALTY COMPANY OF AMERICA, *Appellant.*[1]

[1]Reported in 150 P. (2d) 728.

*A. D. Gillies, Brethorst, Holman, Fowler & Dewar,* and *Robert D. Williams,* for appellant.

*F. L. Morgan,* for respondent.

BEALS, J.—May 13, 1939, Ernest B. Crowell filed with defendant, Sunset Casualty Company of America, his application for a policy of indemnity for loss of life, limb, and other bodily injuries, and also for protection against time lost as the result of accidental bodily injuries or sickness. May 21, 1939, defendant issued its policy of insurance in the principal sum of five hundred dollars, which amount was payable to Mr. Crowell's wife, Georgia E. Crowell, in case of the death of the insured as the result of accident, pursuant to the following clause contained in the policy:

"Part I. INDEMNITY FOR DEATH, DISMEMBERMENT OR LOSS OF SIGHT

"If such injuries shall within ninety days from the date of the accident, be the sole cause of and result in any one of the losses described in the following schedule, the company will pay the sum set opposite such loss in lieu of all other indemnity.

"FOR LOSS OF LIFE........The Principal Sum."

The policy continued in force, and March 27, 1942, Mr. Crowell died while engaged in his occupation as a fireman in the employ of Polson Lumber Company, in the steam plant of its mill B at Hoquiam.

The insurance company having refused to pay any loss under its policy, this action was instituted by Mrs. Crowell, as beneficiary thereunder. In her complaint, after pleading the issuance of the policy, and that it had remained in full force and effect up to the time of Mr. Crowell's death, she alleged that the insured, on the date above mentioned, "lost his life as a direct consequence of an industrial occupational accident, and while engaged in his occupation as fireman of stationary boilers." After other formal allegations, judg-

ment was demanded for five hundred dollars, being the principal sum of the policy.

The defendant answered, admitting that the policy was in full force and effect at the time of Mr. Crowell's death, but denying that the insured lost his life "as a direct consequence of an industrial occupational accident but alleges that no unusual, unforeseen agency or happening was present and unexpectedly caused the loss of life of the said Ernest B. Crowell." Defendant denied all liability under the policy.

The issues having been completed by plaintiff's reply, the action was tried to the court sitting without a jury. At the close of plaintiff's case, the defendant challenged the sufficiency of the evidence, and moved to dismiss the action. After consideration the court filed a memorandum decision directing that this motion be granted. After further consideration, the court changed its opinion upon this matter, and denied defendant's motion. The defendant then introduced its evidence, and at the close of the trial the court entered findings of fact and conclusions of law in plaintiff's favor, followed by the entry of a judgment for plaintiff, from which judgment the defendant has appealed.

Error is assigned upon the denial by the court of appellant's challenge to the sufficiency of the evidence at the close of respondent's case; upon the court's finding that the insured died as the result of an accident; and upon the entry of judgment in respondent's favor.

It appears from the evidence that for almost nine years the insured had been employed by Polson Lumber Company as a fireman in connection with the operation of a steam plant in one of its mills. The insured's son described his father's duties as follows:

"Well, they were to keep up steam so the mill could be operated, and he was to handle all fires, and see that the sawdust and things came in at the right opening or opportune time to keep the fires going at the right intervals and to keep up the steam, and he had to adjust these chutes and things so that the sawdust would run in the fire boxes, and he had to adjust the amounts, and then he had to go back and forth between there and the fuel bins and he had to go

up and down the ladders there some times when the chutes stuck, and clean out sticks and things that caused them to stick."

As a portion of the steam generating plant, there were eight fire boxes into which the fuel was fed by a series of conveyors operating from the fuel bin above the fire boxes. The evidence discloses that the conveyors were opened and closed in the following manner:

"Well, they were a geared contraption, they had a lid that fit on these fire boxes which these gears were attached to, and out at the end of this shaft that runs through there, there was some pulleys and on these pulleys they had a chain. They would have to operate these chains from the floor to open these lids over these holes, and that would send the sawdust from the conveyors into the fire boxes."

It appears that occasionally some of the chains controlling the conveyors would fail to function, and that to release them the fireman would jump on them and release the chain by throwing his full weight thereon. Such an operation obviously required considerable exertion. It also appears that it was the duty of the fireman to clean the grates during each noon hour while the mill was not operating. At such times the steam would be cut out, the fire doors opened, and the ashes and clinkers removed by the fireman on duty. In this operation a steam hose was used, as well as a heavy iron bar. This was the most arduous work connected with the duties of the fireman. It required the exertion of considerable muscular effort in the hot boiler room, and naturally caused the fireman to become very warm and to perspire freely.

The insured had continuously performed his duties as fireman in a normal manner, and apparently without unusual difficulty or discomfort.

A millwright employed at the mill saw the insured at eleven-thirty o'clock in the morning on the day of the insured's death, and testified that at that time Mr. Crowell was perspiring profusely, and said to the witness: "This is a madhouse today." Later, about two o'clock in the afternoon, the witness again passed through the fire room and

observed Mr. Crowell hard at work, but on this occasion nothing was said. About an hour later the witness again approached the fire room, when he observed Mr. Crowell step out of the room with his face upturned. As the two men nearly approached each other, Mr. Crowell collapsed in the arms of the witness, who stated that Mr. Crowell was sweating freely. The witness assisted Mr. Crowell to lie down on the floor, wrapped a jacket around him, and telephoned for an ambulance, which arrived in about ten minutes. While waiting for the ambulance, the witness tried to revive Mr. Crowell by using artificial respiration, but without success. Mr. Crowell died on the way to the hospital.

An autopsy was performed, the physicians stating as their finding the following:

"HEART: The pericardium was opened and three to four c. c. bloody fluid was noted. The heart was found to be of normal size. It was removed and sectioned and the mitral and aortic valves found normal. Both coronary arteries were markedly sclerotic and narrowed. The arteries were opened with considerable difficulty due to their hardness and extreme narrowing of their lumens. No recent thrombus was demonstrated, however, almost complete coronary occlusion, the result of advanced arterio sclerosis was demonstrated. The myocardium was sectioned and was grossly without change except for several areas of fibrosis from one-half to one cm. in diameter at the apex of the left ventricle."

As their conclusion, the physicians stated that "the individual obviously died as a result of coronary occlusion due to advanced coronary artery sclerosis."

Mr. Crowell, on the day he died, had been performing his usual duties as fireman. The work had been hard, because on that day the mill was cutting some hemlock. The usual timber sawed was fir or spruce, and firing with the waste from those logs was easier than when the mill was sawing hemlock, that wood being less inflammable and generally very wet. At least some of the logs which were sawed on the day in question were "deadheads," described by a witness as waterlogged hemlock, the witness testifying: "You just practically got to boil the water out of it before it will burn. That is a real job." The exact proportion of hem-

lock sawed on the day in question, while considerable, is uncertain, but, in any event, it clearly appears that the work Mr. Crowell was called upon to perform was heavier than usual.

Dr. H. C. Watkins, Mr. Crowell's family physician, was called when Mr. Crowell was stricken, but did not reach the hospital until after Mr. Crowell's death. Concerning his knowledge of Mr. Crowell's condition, the doctor testified:

"Q. How often had you seen him prior to the time of his death? A. Oh I would say on an average of about once every three or four months. Q. Did you ever have occasion to examine him as other mill men are sometimes examined? A. No. Q. During any of that time when you were his family physician, was there anything brought to your attention either by his appearance or his statements that would indicate that he had any trouble concerning his heart? A. No. Q. Up to the time of his death did you have in your own mind as his physician, have any reason to believe or to anticipate that there was any trouble with his heart? A. No, I did not. Q. What would you say was the condition of Mr. Crowell's health? A. He was a healthy man as working men go at that age."

The witness testified that he was present at Mrs. Crowell's request when the autopsy was performed by Dr. Baker, and that the witness assisted in the autopsy. Concerning the cause of death, the doctor stated:

"Q. What did you finally determine was the cause of his death? A. The coronary artery, the artery of the heart in Mr. Crowell the autopsy showed was very much sclerosed, which means narrowed, the diameter was probably a quarter of the normal diameter of a coronary artery, and in the opening was a very small plug, thrombus, so-called, which had stopped his heart beating instantly. Q. That was a small clot? A. Very small clot. Q. Technically you call it thrombosis? A. Thrombus, t-h-r-o-m-b-u-s. THE COURT: A mucous plug or something, or was it a growth? A. It wasn't a growth, it was a collection of blood cells, white and red blood cells, which made a very small clot. The opening in the artery was about the size of the head of a lead pencil too. It took very little to stop it. THE COURT: Is that what you call an embolism? A. Well, an embolism is a mass in the circulation that dislodges from some place and goes to

another through the circulation. This seems to have collected right at the,— THE COURT: At that spot? A. At that spot due probably to a spasm of a very much constricted artery. Q. Did you make a report? A. I signed the report."

After several questions by respondent's counsel, to many of which appellant's counsel objected, the witness finally stated as his opinion: "There is no question but what that unusual exertion caused the thrombosis."

On cross-examination, the witness said that Mr. Crowell's condition, as demonstrated by the autopsy, was of slow growth and long standing. The witness stated that he had never taken Mr. Crowell's blood pressure. He testified that a man in Mr. Crowell's condition, as disclosed by the autopsy, might suffer serious results from any unusual exertion. He also testified that many persons who had not engaged in any extra exertion died as the result of coronary thrombosis.

■ It clearly appears from the record that, on the day of his death, Mr. Crowell had been engaged in hard work, undoubtedly heavier than his duties as fireman usually required. The question to be here determined is: Did Mr. Crowell die as the result of an accident, and thereby give rise to a cause of action against appellant upon the policy of insurance? The burden rests upon respondent to show that the death of the insured occurred through accidental means. To justify a recovery upon such a policy as that here in question, the evidence introduced in support of the claimant must be substantial.

In the case of *Hill v. Great Northern Life Ins. Co.*, 186 Wash. 167, 57 P. (2d) 405, we said:

"In an action upon an accident insurance policy, the burden which the injured plaintiff assumes is to show that injury or death was due to accidental or other means specified in the policy. But on the defendant insurer rests the duty to show that the injury or death was caused by some act which is made an exception to the risk in the policy, or that the policy has been avoided by reason of a breach of some condition precedent, or that the action was not brought within the time required by the policy."

Respondent relies upon several of our decisions, commencing with the case of *Horsfall v. Pacific Mutual Life Ins. Co.*, 32 Wash. 132, 72 Pac. 1028, 98 Am. St. 851, 63 L. R. A. 425. It appeared that this was an action to recover on a policy of accident insurance. The insured was a blacksmith, a man of unusual strength and vigor. He had occasion to lift one end of an iron bar weighing from three hundred fifty to four hundred pounds. Immediately after so exerting himself, he complained of being ill, left his work, and died three weeks later as the result of a dilation of the heart. Competent physicians, testifying both for the plaintiff and the defendant, agreed that, under the circumstances, lifting an iron bar of that weight might well cause dilation of the heart. The evidence, then, clearly showed a specific act of a very great and unusual exertion, which of itself might have brought about the condition which caused death. The case is not in point here.

In the case of *Pierce v. Pacific Mutual Life Ins. Co.*, 7 Wn. (2d) 151, 109 P. (2d) 322, an action based upon two accident insurance policies, it appeared that the insured had undergone a great shock, caused by a situation which it appeared to him would inevitably involve him in a serious automobile accident. The insured thereafter suffered from a cerebral hemorrhage which it was alleged was caused by the fright, mental shock, and physical strain induced by the dangerous situation in which he had become involved. Here again was a definite situation, undoubtedly accidental in its nature, which this court held warranted the submission to the jury of the question of the insurer's liability under its policy.

In the recent case of *Graham v. Police & Firemen's Ins. Ass'n*, 10 Wn. (2d) 288, 116 P. (2d) 352, this court affirmed a judgment of the superior court entered upon the verdict of a jury in favor of the plaintiff, in an action upon an insurance certificate issued to O. H. Ebbinghouse. It appeared that the insured was suffering from angina pectoris, and while engaged in his duties as a member of the Seattle fire department was overcome by gas and placed on the disability list for four months. He later resumed his work

with the fire department. Thereafter, in hastening down the basement steps to the aid of his daughter, whose clothing had caught fire, he suffered a severe fall, and in assisting his daughter his hands were burned. After this accident his physical condition suffered a marked deterioration, and he could breathe only with difficulty. He died ten days after the fall, as the result of a coronary occlusion. This court held that the fact that the insured suffered from a heart condition did not prevent a recovery on the policy, and that, in order to support the jury's verdict against the insured, it was

" . . . only necessary for the evidence to disclose that the accident was a direct and proximate cause of the death, and that the proximate cause is

" ' . . . that which sets in motion a train of events which brings about a result without the intervention of any force operating or working actively from a new and independent source.' "

In the case last cited, as in the other cases relied upon by respondent, the evidence disclosed some definite particular occurrence or event which supported a holding by the trier of the fact that the death of the insured was the result of an accident. In the case at bar, the only occurrence relied upon by respondent to support the judgment in her favor was the fact that on the day he died Mr. Crowell was working harder than usual. One working as a fireman, as was Mr. Crowell, naturally works harder some days than others. The record contains no evidence that any one particular event occurred requiring unusual exertion on the part of the insured, which might have brought about his death. Mr. Crowell's work required considerable physical exertion every day. He had filled the position of fireman for almost nine years. Under such circumstances, a hard day's work at the usual occupation of firing a steam plant cannot be considered an accident.

This conclusion is supported by the recent case of *Hodges v. Mutual Benefit Health & Accident Ass'n,* 15 Wn. (2d) 699, 131 P. (2d) 937, which was also a suit upon a policy of accident insurance. From a judgment rendered in favor of the plaintiff upon the verdict of a jury, the defendant ap-

pealed. It appeared that the deceased insured, a man of fifty-five years of age, who had been engaged for many years in road construction, was very fond of dancing, and belonged to a club which held dances every two weeks. He attended these parties regularly, and danced from nine-thirty to midnight. At one of these dances, he apparently enjoyed himself as usual, but, while participating in a fast fox trot, he was taken ill, was removed almost immediately to a hospital, but died upon arrival. The testimony showed that his death was occasioned by coronary occlusion. In reversing the judgment appealed from and directing that the action be dismissed, we said:

"In the case at bar, the insured was doing an ordinary and customary act in his usual way and no unexpected event interposed itself to cause injury. The dance was described as a fast fox trot. That dance, so far as the facts indicate, was no different from any other modern lively dance and called for no violent action other than that which was incident to the activity of dancing and readily foreseeable by the insured. The insured's death was not caused by an unexpected event which happened by chance.

"True, death is in most instances unexpected, but to hold that all unexpected deaths are accidental and that insurance companies which insure against accidental death are liable on that ground, would amount to a rewriting of such policies by the courts and put into each of those policies an intent that was never conceived by either the company or the insured at the time the policies were written. That, the courts cannot do. Courts may only determine the legal effect of contracts."

■ In the case at bar, as in the *Hodges* case, no accident is shown. An affirmance of the judgment appealed from would be equivalent to a holding that any exertion, normal in nature, but greater than average, or strain due to such continued exertion, would, if resulting in such a condition as that which occasioned Mr. Crowell's death, constitute an accident within the meaning of such a policy as that now before us. The law does not support such a holding. On the day of his death, the insured worked as he had worked many days before during the years of his employment.

248

There is no evidence suggesting the intervention of any unforeseen or even unusual agency or event.

Respondent cites numerous authorities supporting the proposition that, in actions upon insurance policies, ambiguities must be resolved in favor of the insured and against the insurer. These cases have no application here. The language of the policy is not ambiguous, and there is nothing requiring construction. The meaning of the word "accident" is well established by the lexicographers and by common usage.

Respondent failed to prove that the injured had suffered from any accident, and failed to bring her claim within the coverage of the policy.

The judgment appealed from is reversed, with instructions to dismiss the action.

SIMPSON, C. J., STEINERT, JEFFERS, and GRADY, JJ., concur.