[No. 25364.  *En Banc.*  October 18, 1935.]

JAMES T. KELLEY *et al., Appellants,* v. J. G. VON HERBERG *et al., Respondents.*[1]

[1]Reported in 50 P. (2d) 23.

›

*Preston, Thorgrimson & Turner,* for appellants.

*Allen & Wilkins* and *Battle, Hulbert, Helsell & Bettens,* for respondents.

BLAKE, J.—For many years, the plaintiffs have been the owners of a plot of ground at the southeast corner of Sixth avenue and Pine street, in Seattle. On March 17, 1928, they, as lessors, and the defendant J. G. von Herberg, as lessee, executed a lease for a term of ninety-nine years. A monthly rental of two thousand dollars was reserved for four years and eleven months, beginning June 1, 1928. In addition, the lessee covenanted and agreed to pay all taxes, assessments and charges of every kind that might become a lien on the property. The lessee further covenanted to erect on the property a fireproof building of not less than three stories, on a foundation capable of carrying six stories. The lease contained a provision permitting assignment upon the completion of the building, free from liens—provided the lessee be not in default in any of the covenants and agreements to be by him kept and performed. There was no provision, however, for the release of the lessee on his obligations under the lease. The lessee erected a building in substantial compliance with the covenant.

In February, 1932, the lessee caused to be organized the corporation, Sixpine Leaseholders, Inc. To this corporation he assigned the lease. In consideration of the assignment, he received all of the capital stock of the corporation and a note executed by it for $23,850. The corporation assumed and agreed to perform all the

covenants and agreements contained in the lease. It appears, however, that its only asset was the leasehold in the property at Sixth and Pine.

There was default in payment of rent due May 1 and June 1, 1932. Also, default was made in payment of taxes for the first half of 1931, which, but for payment by the lessors, would have gone delinquent June 1, 1932.

June 2, 1932, the lessors declared a forfeiture, which became effective July 2, 1932. The premises were surrendered to the lessors early in the latter month.

The lease contained a provision allowing redemption by the lessee any time within six months after date of forfeiture. Redemption not having been made, plaintiffs brought this action. In their complaint, they set up two causes of action. The first was a suit to quiet title. The second was to recover from the defendants von Herberg rent due under the lease for the months of May, June and July, 1932; the full amount of the 1931 taxes ($19,332.88); the full amount of the 1932 taxes ($16,646.27); and $375 for attorney's fees alleged to have been theretofore paid in connection with the enforcement of their rights under the lease. They also asked for an allowance of attorney's fees in the present action.

The defendants von Herberg answered, alleging that, prior to the execution of the lease, it was the understanding and agreement of the parties that, upon assignment of the lease pursuant to its terms, the von Herbergs would thereupon be relieved and released from all further obligation under the lease. They further alleged that such understanding and agreement had been omitted from the lease through the mutual mistake of the parties. They prayed for reformation of the lease in this respect, and that the complaint be dismissed.

The court entered a decree quieting title in plaintiffs on the first cause of action. It dismissed the second cause of action, decreeing that the lease be reformed " . . . so as to provide that upon an assignment thereof by the lessee therein named as therein provided, said lessee be released and relieved from any and all further obligations or liability thereunder and the following stipulation, to-wit:

" 'Section 3. And it is further covenanted and agreed by and between the parties hereto that the parties assigning or conveying the leasehold estate hereby created upon the conditions and in the manner hereinbefore set forth, shall thereby be forever released and dischargd from any and all obligations arising or accruing under the covenants and agreements in this lease, subsequent to the date of such conveyance or assignment, and subsequent to the date of the erection upon said premises of said building in accordance with the provisions of this lease and the completion thereof and full payment therefor, provided such conveyance or assignment shall have been made to carry into effect an absolute and bona fide sale of lessee's interest in said premises.' is hereby made a part of said lease, to follow section 2 of Article XXIV, on page 34 thereof, to the same effect as though said stipulation had been contained in said lease at the time the same was executed by plaintiffs and the defendant J. G. von Herberg.''

Plaintiffs appeal.

As we see it, the problem resolves itself to a determination of the legal sufficiency of the evidence to warrant reformation of the lease, as decreed by the court. This will entail an extensive consideration of the evidence of the negotiations leading up to the execution of the lease.

Sometime in the fall of 1927, a real estate broker by the name of McGill became active in an attempt to bring Kelley and von Herberg together on a long term lease of the property at Sixth and Pine. After getting

the negotiations started, McGill called in another broker by the name of Wilson. Later on, at the instance of von Herberg, another broker (Gottstein) was brought into the negotiations.

The parties did not arrive at the point of reducing their engagements to writing until the latter part of January, 1928. At that time, Mr. Jay C. Allen, representing von Herberg, and Mr. A. R. Hilen, representing Kelley, came into the negotiations. Mr. Allen testified that his first contact with the situation was when McGill and Kelley came into his office and told him an agreement had been reached between Kelley and von Herberg, and that what was known as the ''Hughes lease'' was a form satisfactory to Kelley.

However this may be, a proposed lease (designated in the record as the first Hilen lease) was submitted to Mr. Allen, as attorney for von Herberg. Mr. Allen made certain pencil notations on the proposed lease and returned it to Mr. Hilen, who then made a second draft of the lease. The attorneys then got together and discussed the provisions of the second draft and agreed upon changes to be made. Mr. Hilen made a third draft. In the so-called Hughes lease, and in all three of the proposed leases drawn by Mr. Hilen, there was a provision for the release of the lessee identical with that contained in the decree of the court, which we have quoted.

Mr. Hilen sent a copy of his third draft to Mr. Allen, and gave a copy to Kelley. According to Mr. Hilen's testimony, this was the only draft of the lease that he submitted to Kelley.

Shortly after this, Kelley dismissed Mr. Hilen and retained O. B. Thorgrimson. Kelley left the third Hilen draft with Mr. Thorgrimson, with instructions to draw a lease which would fully protect his (Kelley's) interests; to draw a lease such as he would draw

for himself (Thorgrimson); that he wanted to hold von Herberg. Kelley also asked Mr. Thorgrimson not to mention to anyone the fact that he had been retained.

Mr. Thorgrimson drafted a lease, which he submitted to Kelley. This proposed lease did not contain any provision for the release of the lessee upon assignment. The proposed lease was submitted to Mr. Allen, who, after an examination of the instrument, addressed a letter to von Herberg, under date of February 25, 1928, commencing in the following language:

''At your request, I have examined the redraft of the proposed lease from James T. Kelley and wife.

''The criticisms and suggestions which I make herein are not noted or stated in the order of their importance, but as I came across them.''

Then follow sixteen numbered paragraphs, covering four and one-half pages, of criticisms and suggestions. A copy of this letter came into the hands of Mr. Thorgrimson, who discussed the criticisms and suggestions with Kelley.

Mr. Thorgrimson and Mr. Allen had a conference, at which each made concessions on behalf of their clients. Thereupon, Mr. Thorgrimson redrafted the proposed lease. This draft did not contain any provision for release of the lessee upon assignment. This proposed draft was submitted to Mr. Allen, who suggested some changes, whereupon Mr. Thorgrimson drew the lease as finally executed. In the meantime, on March 8th, Mr. Allen had addressed another letter to von Herberg, commencing as follows:

''In re: Kelley Lease.

''Since my letter of February 25th there have been frequent conferences about it. Certain of my objections you have waived, and others Mr. Kelley has agreed to. In view of these facts I now advise that,

if the lease is changed in the following particulars, I see no objection to your executing it."

Then follow, numerically, nine objections. In addition, by way of addenda or postscript, are two more. Neither in this nor in the letter of February 25th was the absence of the release clause noted.

The question of von Herberg's personal liability was evidently a contentious subject all through the negotiations; for the so-called first Hilen draft ran from the Kelleys, as lessors, to

"    . . .    _____, a corporation organized and existing under and by virtue of the laws of the state of Washington, having its principal place of business in the city of Seattle, county of King, in said state, hereinafter called lessee."

The respondents admit that Kelley was not willing to give a lease to a corporation. Their position is that he was at all times willing to release von Herberg upon the completion of the building, free from liens, and that he agreed to a release clause of the character and substance set out in the decree of the trial court.

Although more than six years had elapsed, and although the omission of the release clause from the lease was not discovered by any of them until after the notice of forfeiture was given by Kelley, June 2, 1932, von Herberg, Allen, Wilson, and Gottstein, all testified circumstantially that, during the progress of the negotiations, Kelley had repeatedly stated that he only wanted to hold von Herberg personally liable until a building, free from liens, was completed in accordance with the provisions of the lease; that he would be content with the security afforded by the building, and that von Herberg could then assign the lease and be relieved of further liability.

In addition to the testimony of these witnesses, who

participated in the negotiations, Mrs. Brooks, a stenographer in Mr. Allen's office, one Watt, von Herberg's private secretary, and Miss Willa, a stenographer in his office, testified to having heard Kelley make statements of such character and substance. In view of the fact that Mr. Allen testified that he sent the second and third Hilen drafts to von Herberg's office, with the request that Watt compare them, we think the latter's testimony and that of Miss Willa is of sufficient interest to bear quotation.

Watt testified:

"Mr. Kelley came into the office, as I remember it, some time shortly after the first of the year, and that morning Mr. Allen had called and asked me if I could check over a lease that he was—that had been prepared, and in which there were some changes to be made, and I said I guessed we could take care of it. In fact we were pretty busy, but we could take care of it, and he asked me to come across the street and pick up the leases, and I went across the street, and he gave me two copies of the lease, one on which had been written in pencil some changes, and the other had been copied from that. . . . He (Kelley) came in the office and asked for Mr. von Herberg. I said he was not in at the present time. He said 'You folks seem to be pretty busy,' and I said 'We are comparing a lease. I think we are doing a lot of unnecessary work, because it is a lease about some property of yours, and I am sure Mr. von Herberg will not sign it,' and he said 'What is the trouble,' and I said 'He does not want to be personally liable on a long-time lease,' and he said 'I have already told him he only has to be liable up to the time the building is completed, which will be my security, and then he can be released from his personal liability'."

Miss Willa testified:

"Mr. Watt had one of the copies which he had received from Mr. Allen, and Mr. Watt was reading it, and I had the other copy. It was quite a lengthy one, and Mr. Watt would get tired reading and I would

read a while. There were pencil notations I remember on one of them, and Mr. Watt would call my attention to them as he was reading, so we could see if they were in the other copy of the lease. . . . My recollection of the incident is that Mr. Watt was seated at his desk, and started talking to Mr. Kelley regarding the lease, and Mr. Watt, as he testified, said he did not believe Mr. von Herberg would sign the lease, and . . . On account of being a personal liability for the ninety-nine years, and I believe that is why I have such a distinct recollection of it, making one person liable for that length of time, and Mr. Kelley said he did not see why Mr. von Herberg would not sign it, for the simple reason that after the building was erected and it had been completed and was free of all encumbrances Mr. von Herberg was to be released.''

In connection with this testimony of Watt and Miss Willa, it is to be recalled that both these drafts of the proposed lease contained the release clause adopted by the trial court in its decree reforming the lease. The significance of their testimony, as well as that of von Herberg, Allen, Wilson, and Gottstein, is that, all through the negotiations, von Herberg's personal liability (and the extent of it) was a vital subject of discussion. It should be said, in passing, that Kelley categorically denied all such statements attributed to him by the witnesses for the respondents. However, the numerical weight of the testimony is so overwhelmingly against him that we are not disposed to disagree with the conclusion of the trial court to the effect that he made them. So, giving full force to respondents' version of the negotiations with respect to the release clause, the question remains: Do the facts call for a reformation of the lease?

In their answer, respondents set up mutual mistake as the ground for reformation. Under the facts, there is no ground for reformation on the theory of *mutual* mistake. So the question narrows: Was

there such fraudulent and inequitable conduct on the part of Kelley, coupled by mistake on the part of von Herberg, as to call for a reformation of the lease?

Under the evidence, there is no question about mistake on the part of von Herberg in executing the lease without a provision for his release from liability upon assignment after completion of the building. So the ultimate question is: Was Kelley guilty of fraud or inequitable conduct?

Now, fraud may consist of positive representations, artifice or concealment. There is nothing in the record to justify any inference that Kelley or Mr. Thorgrimson made any representation of any nature with respect to the contents of the lease—as to whether it contained a provision for the release of the lessee upon assignment. Nor is there any claim that artifice of any kind was used to induce von Herberg to sign the lease. At the time the lease was executed, there were present Mr. and Mrs. Kelley, Mr. von Herberg, Mr. Thorgrimson, Mr. Allen, and the notary who took the acknowledgments. Mr. Allen asked if the changes agreed upon had been made. Upon Mr. Thorgrimson's statement that they had been, the lease was executed. There is no contention that this statement was not correct. So we have left for determination the question of whether Kelley was guilty of fraud by not disclosing to von Herberg the fact that the lease did not contain a provision for the release of the latter upon assignment after completion of the building.

Concealment of a material fact, by one having knowledge of it from one who is in ignorance of it, may constitute fraud—but only when there is a duty, on the part of the one having knowledge, to speak. 26 C. J. 1073. It is there said:

"Whether a duty to speak exists in a given case is a question depending upon the peculiar facts in-

volved, such as the nature of the transaction, the mutual relation of the parties, and their respective knowledge and means of knowledge.''

Ordinarily, a duty to speak arises only out of a trust or fiduciary relationship between the parties. 2 Pomeroy, Equity Jurisprudence (4th ed.), §§ 901, 902. Sometimes the circumstances surrounding the dealings and negotiations of the parties are such that courts have held that a failure to speak constitutes fraud or inequitable conduct, even though, strictly speaking, no trust or fiduciary relationship exists. Those cases are predicated on the theory, at least, that such special circumstances create a relationship of trust and confidence upon which the injured party is entitled to rely. See *Stone v. Moody,* 41 Wash. 680, 84 Pac. 617, 5 L. R. A. (N. S.) 799. The respondents take the position that the facts and circumstances surrounding the negotiations and dealings between themselves and Kelley created such a situation of trust and confidence as required Kelley to speak. But in face of the decision just mentioned, we think this court is firmly committed to the doctrine that, as between parties dealing at arm's length, who have the same means of acquiring knowledge, silence on the part of the one having knowledge is not actionable.

This court has gone so far as to hold that, as between parties so dealing, even positive representations as to the contents of a written instrument will not serve as the basis of an action for equitable relief. *Hubenthal v. Spokane & Inland R. Co.,* 43 Wash. 677, 86 Pac. 955. That case is so closely analogous as to be controlling in the instant case. We shall, therefore, consider and quote from it at some length.

Hubenthal executed a deed to the railway company for a right of way. The deed contained certain specific covenants and agreements to be performed by

the grantee. Hubenthal brought the action, setting up certain additional covenants and agreements to be performed by the grantee, which he alleged had been promised by the agents of the railway company during the negotiations leading up to the execution of the deed. Among such agreements alleged to have been made, was one to the effect that the railway company would not make any fills on the right of way, but would construct trestles over depressions where fills would otherwise be required. The railway company having started to make fills, Hubenthal sought injunctive relief to prevent the railway company from making fills. Had the relief sought been granted, it would have transformed the deed from a grant in fee simple to an easement. Judge Rudkin, speaking for the court, said:

"The only question arising on the first cause of action is this: does the allegation,

" 'That at the time said agreement for the right of way was entered into between plaintiffs and defendant corporation, the said defendant corporation proposed to plaintiffs that they would reduce the said agreement to writing and would prepare the necessary instrument for the purpose of carrying out said contract, and thereafter said defendant corporation did present to plaintiffs a certain agreement in writing, which said defendant corporation said embraced the agreement so made for the said right of way, and requested plaintiffs to sign the same, and plaintiffs, believing that the said instrument so presented contained the agreements for said right of way as above alleged, thereupon executed such agreement and the said defendant corporation took possession of the said instrument, and at all times since has retained the same. That plaintiffs have no knowledge as to the exact contents of said agreement so signed, but signed and executed the same on the understanding and representations that it contained the agreements of the parties as above alleged;'

entitle the appellants to equitable relief on the ground of fraud or mistake, simply because the agreement does not embody all the prior stipulations of the parties? We are of opinion that it does not. In *Washington Central Imp. Co. v. Newlands,* 11 Wash. 212, 39 Pac. 366, this court said:

" 'Conceding that these representations were false, and conceding that the purchaser relied upon them, there is not yet enough shown, it seems to us, in this answer to give the defendant relief. There is no fiduciary relation between the seller and the buyer alleged. It is not alleged that the buyer was in such a position that he was unable to make an investigation concerning the truth or falsity of these alleged representations. So far as the allegations of the answer are concerned, there is nothing to show that the land was not at hand when this contract was made, and that it could not, by the use of ordinary prudence, have been investigated by the purchaser; and in cases of this kind, it seems to us that parties must exercise ordinary business sense, and the faculties which are given to them for the purpose of transacting business; and that they cannot call upon the law to stand *in loco parentis* to them in the ordinary transactions of business, and their ordinary dealings with their fellowmen. . . . If people having eyes refuse to open them and look, and having understanding refuse to exercise it, they must not complain, when they accept and act upon the representations of other people, if their venture does not prove successful. Written contracts would become too unstable if courts were to annul them on representations of this kind.'

"The rule above announced has been reiterated in many subsequent cases. *West Seattle Land & Imp. Co. v. Herren,* 16 Wash. 665, 48 Pac. 341; *Griffith v. Strand,* 19 Wash. 686; 54 Pac. 613; *Walsh v. Bushell,* 26 Wash. 576, 67 Pac. 216; *Samson v. Beale,* 27 Wash. 557, 68 Pac. 180; *Sherman v. Sweeny,* 29 Wash. 321, 69 Pac. 1117; *Hulet v. Achey,* 39 Wash. 91, 80 Pac. 1105; *Lake v. Churchill,* 39 Wash. 318, 81 Pac. 849; *Walsh v. Meyer,* 40 Wash. 650, 82 Pac. 938. True, in nearly all of these cases the false representations related to the quality, quantity, or condition of prop-

erty embraced in a contract of sale or deed, but if a party cannot rely upon the representations of others as to such matters when the means of investigation are at hand, should not the rule apply with even greater strictness where an attempt is made to avoid the effect of a written contract which a party has signed, relying solely upon the representations of another as to its contents. In *McCormack v. Molburg,* 43 Iowa 461, the plea of fraud or mistake was even stronger than in this case. A demurrer was sustained to the plea and in affirming the judgment the court said:

" 'In *Bell v. Byerson,* 11 Iowa 233, it is said if the means of knowledge of the alleged fraud were equally open to both parties the law will not interfere to protect the negligent; and in *Rogers v. Place,* 29 Ind. 577, it is said if no device is used to put him off his guard, a party who, having capacity to read an instrument, signs it without reading, places himself beyond legal relief. "If the truth or falsehood of the representation might have been tested by ordinary vigilance and attention, it is the party's own folly if he neglected to do so, and he is remediless." 2 Parsons on Contract, 772; Kerr on Fraud and Mistake, 77. To the same effect is the late case of *Nebeker v. Cutsinger,* 48 Ind. 436. The defendant does not state that plaintiffs used any artifice to prevent him from reading the contract, nor does he state that he was unacquainted with the English language, or that he could not read. In fact no excuse whatever is given, except that he signed the contract relying on the representation of plaintiffs as to its contents. This is inexcusable neglect, and the defendant must suffer the consequences of his own folly. The effect of such a rule as that claimed by appellant would be to render written contracts of but little practical value over those existing in parol only. The authorities cited by counsel for the appellant are not in point. In *Walker v. Ebert,* 29 Wis. 194, the defendant was a German by birth and education and unable to read the English language. With scarcely an exception, where the rule has apparently been recognized different from that herein established, some such excep-

tion will be found to exist, or some artifice used to obtain the signature of the party or to prevent him from reading the contract. None such exist in this case, and the judgment of circuit court must be affirmed.'

"Without reviewing all the cases cited, it will be found that in nearly all of them appears some fact or circumstance tending to show fraud or mistake aside from the mere reliance on the representation of the other party to the contract as to its contents, such as inability to read or understand the language of the contract, a relation of trust or confidence between the parties, or some artifice used to obtain the signature of the party or prevent him from reading the contract."

This case has repeatedly been cited as authority for the principle stated. *Golle v. State Bank of Wilson Creek,* 52 Wash. 437, 100 Pac. 984; *Fidelity & Casualty Co. of New York v. Nichols,* 124 Wash. 403, 214 Pac. 820; *Johnston v. Spokane & Inland Empire R. Co.,* 104 Wash. 562, 177 Pac. 810. In the last cited case, Judge Holcomb, speaking for the court, said:

"We have always held that a party whose rights rest upon a written instrument which is plain and unambiguous, and who has read or had the opportunity to read the instrument, cannot claim to have been misled concerning its contents or to be ignorant of what is provided therein."

We are satisfied that the doctrine of the *Hubenthal* case is sound; that, if the integrity of written instruments is to be maintained, the doctrine must be adhered to and applied in this case. So, applying it, Mr. von Herberg cannot be heard to say that he did not know that the lease did not contain a provision releasing him from liability upon completion of the building.

The amount appellants are entitled to recover remains to be determined. The rule is that the lessor

is entitled to recover all payments on which the lessee is in default at the time of forfeiture. *Rockwell v. Eiler's Music House,* 67 Wash. 478, 122 Pac. 12, 39 L. R. A. (N. S.) 894; *Barrett v. Monro,* 69 Wash. 229, 124 Pac. 369, 40 L. R. A. (N. S.) 763. In the former case, the court quoted with approval the following from *American Bonding Co. v. Pueblo Inv. Co.,* 150 Fed. 17:

"The termination of a lease during its term by surrender, by re-entry, or by eviction, without more, discharges the lessee from liability for rents that have not accrued, but leaves him liable for all the rents which have accrued and become due, and for the performance of all covenants whose fulfillment is due."

The appellants declared forfeiture June 2, 1932. The forfeiture became effective July 2, 1932. Rent was payable on the first day of each month. So, when the forfeiture became effective, the lessee was in default in rent in the sum of two thousand dollars due May 1st, two thousand dollars due June 1st, and two thousand dollars due July 1st. The property was surrendered to the lessors early in July, and they collected rents from subtenants for that month. But this does not affect the obligation of the lessees under the rule above stated. So we hold that appellants are entitled to recover the amount of rent due for May, June and July, with interest at the rate of ten per cent from the due dates, as provided for in the lease.

With respect to payment of taxes, the lease provided: "The lessee shall pay all . . . taxes at least ten days before delinquency." The first half of 1931 taxes became delinquent June 1, 1932. The lessees were, therefore, in default under the above covenant May 22, 1932. Under the covenant, however, these were the only taxes for which the lessee was in default at the time the forfeiture became effec-

tive on July 2nd. For the last half of 1931, taxes did not become delinquent until December 1, 1931. Clearly, the lessee was not in default in payment of such taxes under the covenant.

The appellants contend, however, that, since the lessee covenanted to pay "all taxes . . . that may be levied, assessed, charged or imposed . . . during the entire term of this lease . . . ," they are entitled to recover the last half of the 1931 taxes and all of the 1932 taxes. This contention is predicated on the theory that the obligation of the lessee to pay accrued when the taxes became a lien. We do not think this contention is consonant either with the terms of the lease or the rule stated in *Rockwell v. Eiler's Music House, supra.* To sustain appellants' position, we would have to ignore the provision of the lease permitting the lessee to pay taxes at any time prior to ten days before delinquency. Further, we should do violence to the rule of the *Rockwell* case by allowing recovery for a default occurring subsequent to forfeiture.

We are confirmed in this view by the case of *Chavelle v. Duclos,* 154 Wash. 492, 282 Pac. 843. Although the latter case is one involving the rights and liabilities of vendor and purchaser, the principle stated is applicable here:

"Notwithstanding appellant's undoubted right to recover prior to forfeiture under the terms of the contract as written, when he undertook to forfeit and repossessed himself of the property, he thereby terminated the liability of the vendees *in toto.*"

We hold that the lessee was in default in payment of taxes only for the first half of 1931, amounting to $9,666.44. Appellants are entitled to recover that amount, with interest at the rate of ten per cent per annum from date of payment.

The lease provided that:

". . . lessee will also pay all costs and reasonable attorney's fees which may be incurred or paid by the said lessors in enforcing the covenants and agreements of this lease . . ."

Under this clause, appellants seek to recover $375, incurred for the services of attorneys during the period from February 1 to August 10, 1932. After the payment of the October, 1931, rent, the lessee did not pay rent on the due dates. Several notices of default were prepared and served on the lessees. Undoubtedly, attorney's fees in that respect were incurred "in enforcing the covenants and agreements of the lease." But much of the $375 was charged for advice given in construing the lease with respect to the advisability of declaring a forfeiture. Such advice we do not think comes within the terms of the covenant. The charges are so commingled that we are unable to say what portion of the $375 may be designated as "fees . . . incurred . . . in enforcing the covenants and agreements of the lease." The claim, therefore, will not be allowed.

The appellants prayed for attorney's fees in the sum of $2,500 to be allowed in this action. It was stipulated that the court might fix the fee, in the event of recovery by appellants. This is essentially an action to enforce the covenants and agreements of the lease, and appellants are entitled to recover a reasonable attorney's fee. *Parish v. Studebaker,* 50 Cal. App. 719, 195 Pac. 721; *Eiler's Music House v. Oriental Co.,* 69 Wash. 618, 125 Pac. 1023.

The judgment is reversed, and the cause is remanded with directions to the trial court to fix a reasonable attorney's fee to be allowed appellants in

this action and to enter judgment in accord with the views herein expressed.

MITCHELL and MAIN, JJ., concur.

TOLMAN, J. (concurring in the result)—Disregarding entirely the issue discussed by the majority, upon which I express no opinion, still, very clearly, upon another ground the judgment of the trial court cannot be permitted to stand.

If we assume that the trial court was justified in reforming the lease, as he did, or, if the lease as originally written had contained the language which the respondents claim was agreed upon, still the lessee could not escape liability unless it appeared that "such conveyance or assignment shall have been made to carry into effect an absolute and bona fide sale of lessee's interest in said premises." The assignment of the lease, made but a month or two before default, when the financial difficulties were fully apparent, to a corporation without assets or financial ability, of which corporation the original lessee was the directing and managing head, practically the sole stockholder and the principal creditor, cannot be held to be an absolute and bona fide sale. The assignment was obviously made in bad faith for the sole purpose of escaping liability, and the lessee must be held to be still bound. *DeLano v. Tennent,* 138 Wash. 39, 244 Pac. 273, 45 A. L. R. 766; *Associated Oil Co. v. Seiberling Rubber Co.,* 172 Wash. 204, 19 P. (2d) 940; *Sheffield Co. v. R. Hoe & Co.,* 173 Wash. 489, 23 P. (2d) 876; *Wilson v. Washington Concrete Pipe Co.,* 178 Wash. 545, 35 P. (2d) 71.

I therefore concur in the results.

STEINERT, J., concurs with TOLMAN, J.

BEALS, J. (concurring)—I concur in the majority opinion, and I also agree with Judge Tolman in his

opinion that the judgment should be reversed in any event, for the reasons he assigns.

HOLCOMB, J. (dissenting)—The majority opinion is radically wrong on the matter of the reformation of the lease, does not apply the proper legal test, and disregards our precedents.

The majority concede that the finding of the trial court that the proposed release clause, releasing von Herberg from personal liability when the building had been completed and freed from incumbrances, was supported by overwhelming testimony, and the testimony of Kelley to the contrary was untrue.

The majority also adopt the testimony that it was the vital subject of discussion all through the negotiations, yet the majority reach the astounding conclusion that there is no ground for reformation on the theory of mutual mistake, contrary to the great weight of authority and to the consistent decisions in this state.

*Washington Central Imp. Co. v. Newlands,* 11 Wash. 212, 39 Pac. 366, an action for damages for misrepresentation as to the amount or character of land sold and of improvements, has not the slightest bearing on a case of this kind.

This is no more than a mistake of the scrivener, as was true in *Dennis v. Northern Pacific Railway Co.,* 20 Wash. 320, 55 Pac. 210. We there said that the real inquiry was not how the scrivener came to make the mistake, but was the mistake actually made so that the mutual agreement of the parties was not effected by the instrument. The same principle was followed in *Murray v. Sanderson,* 62 Wash. 477, 114 Pac. 424; *Silbon v. Pacific Brewing & Malting Co.,* 72 Wash. 13, 129 Pac. 581; *Chapman v. Milliken,* 136 Wash. 74, 239 Pac. 4; *Stubbe v. Stangler,* 157 Wash.

283, 288 Pac. 916, and *Spencer v. Patton,* 179 Wash. 50, 35 P. (2d) 768.

It is beyond my comprehension how the majority can hold that there was no ground for reformation of the lease in question on the theory of mutual mistake.

For these reasons, I am compelled to dissent. The judgment should be affirmed.

