[No. 26507.   Department One.   March 3, 1937.]

CAREW, SHAW & BERNASCONI, INC., *Appellant*, v. GENERAL CASUALTY COMPANY OF AMERICA, *Respondent*.[1]

[1]Reported in 65 P. (2d) 689.

*McClure & McClure,* for appellant.

*Ralph S. Pierce, Edwin J. Cummins,* and *Gordon H. Sweany,* for respondent.

MILLARD, J.—This action was instituted for recovery on a burglary insurance policy on a safe and its contents. Trial of the cause to a court and a jury resulted in a verdict in favor of the plaintiff for the full amount for which it prayed. Motion for judgment notwithstanding the verdict was granted, and judgment of dismissal entered. Plaintiff appealed.

On September 29, 1934, appellant, a domestic corporation, commenced business as a cash department store in Seattle. Mark T. Shaw, its vice-president, was charged with the duty of obtaining insurance protection for appellant. On September 28, 1934, when Graham John Smith, an agent of respondent insurance company, endeavored to interest Shaw in fire insurance, the latter informed Smith that the appellant desired nothing other than burglary safe insurance.

Smith stated to appellant's vice-president that it was necessary for the safe to be examined by George Fuller, an employee of respondent, who was familiar with burglary safe insurance. Later the same day, Fuller and Smith called on Shaw. On that occasion, Fuller examined the safe and the chest inside of the safe, measuring the thickness and ascertaining the nature of the walls to determine the amount of the premium for the burglary insurance desired. This investigation disclosed that the chest inside the safe was

burglar-proof, under the accepted rating classification, and would carry the basic rate of $5.00 for one thousand dollars of insurance, from which a 10% credit for a watchman and a 15% credit for an alarm service were deducted, making a total of $3.82½, while the safe proper, being fire-proof only, would take a basic rate of $16.50, subject to the same deductions.

Testimony on behalf of the respondent is to the effect that inquiry was made by Fuller and Smith as to whether the money was to be kept in the burglar-proof chest or in the safe outside the chest. The place in which the money was kept would, of course, make the difference in the amount of the premium. Though Shaw and two employees of the appellant denied that such an inquiry was made, appellant, in its reply to respondent's answer, admitted that agents of respondent "examined the safe to be insured and asked if the property to be insured was kept, or to be kept, in the inner chest." Smith, respondent's agent, testified that, at the time of the meeting of Fuller and Shaw, Fuller informed Shaw of the difference in the rate, and, on Shaw's assurance that the money was kept in the chest, quoted to Shaw only the lower rate covering the chest.

After Fuller examined and measured the safe and quoted the rate for insurance to Shaw, the latter telephoned to Lambuth, of the firm of Lambuth, Sills & Company, insurance and real estate agents, who handled the appellant's insurance business, discussed the rate with Lambuth, and, after that telephonic conversation, Shaw advised Fuller and Smith he would give his answer to them later on the matter of insurance. Shaw then instructed Lambuth to obtain the insurance from respondent. Lambuth, in turn, so instructed H. C. Roach, of the office of Lamping & Company. Roach telephoned to Fuller, ordering the in-

surance and at the same time ordering a binder to give protection pending delivery of the policy. Fuller thereupon executed and delivered the insurance binder to Shaw, who carefully examined it, noted that it was in accordance with his oral order to Fuller, and filed it away. The binder, which is dated September 28, 1934, was issued, respondent admits, by Fuller on that date, and covered the entire safe, which binder was mailed to Lamping & Company.

In explanation of the coverage of the safe and chest and the issuance of the binder, Fuller testified that the respondent had not received a definite order for the business on the basis of the quotation to Shaw, and that it is the practice of the insurance company, when so requested by the agent, to issue a binder giving to the assured protection until the definite order is received. This binder, which reads as follows, is dated September 28, 1934, and was received by Shaw the following day:

"GENERAL CASUALTY COMPANY OF AMERICA
"Seattle, Wash.
hereby acknowledges itself bound by a Burglary or Glass Insurance undertaking, the subject matter of the insurance being described in the following Schedule; and during the term of this Binder the actual contract of insurance shall be evidenced by such of the printed policy form blanks in use by the Company during such term as are indicated by the letters given in the Schedule. The term of this Binder shall end at twelve and one minute o'clock A. M. of the tenth day following that upon which the Binder takes effect. Standard Time to apply at the place where this Binder has been countersigned.

"A pro rata premium charge will be made for this Binder unless a policy or policies are issued and accepted by the Assured covering its term, and the issuance of such a policy or policies shall void this Binder.

"Schedule
"Assured Carew-Shaw & Bernasconi, Inc.
Address: Seattle, Washington.

| "Policy Form | Premium Rate | Amount of Insurance | Term |
|---|---|---|---|
| "Mercantile Safe Burglary | | $10,000.00 | |

"Description of Risk
    "Norris Safe & Lock Co. safe and chest No. 43-72-6; situate premises of the Assured, SW. Cor. 2nd & Pike Street, Seattle, Washington.

| | |
|---|---|
| "This Binder becomes effective "Date September 28, 1934, hour 12:01 A. M. | Insurance ordered by<br><br>Lamping & Company |

| | |
|---|---|
| "Countersigned at Seattle, Washington<br><br>"by............................................................<br>        *Authorized Agent.* | QUADRUPLICATE<br>Broker's Copy |

"Not valid unless countersigned by an authorized agent, or if any modification or change is made in the printed parts hereof."

In less than ten days, a burglary insurance policy covering only the chest in the safe, bearing date October 4, 1934, was delivered to appellant. Shaw testified that he assumed that the terms of the policy followed the terms of the binder, and that he filed the policy away without reading it.

Further testimony on behalf of the respondent is to the effect that, the morning following Fuller's examination of the safe and chest, Shaw discussed the question of insurance with representatives of Lamping & Company, which company is general agent for a number of insurance companies, but not for the respondent. After the discussion, Shaw decided to take the respondent's policy, and, at Shaw's request, Lamping & Company, through Mr. Roach, ordered the three-year policy for $10,000, in accordance with the quotation made direct by Fuller to Shaw. The policy was issued upon the

quoted rate of $3.82½ per thousand per annum, with a further reduction in rate for writing the three-year policy.

It plainly appears that the policy covers only property inside the chest inside the safe. This policy, which bears date October 4, 1934, is for the period from September 28, 1934, to September 28, 1937. That portion of the policy in which appears a description of the insured property is typewritten, and appears on page three of the policy. Effective December 1, 1935, the coverage was increased from $10,000 to $20,000, as appears by endorsement No. 1 attached to the policy.

On December 22, 1935, the safe was burglarized, and in excess of $14,000 was taken from the safe. The chest, anchored in one corner of the safe, was of burglar-proof construction, the doors and walls more than an inch thick, composed of two types of steel, and the door of the chest was fitted with a burglar-proof hinge and two combination locks. There was no burglarious entry into the chest.

Citing *Gattavara v. General Ins. Co.*, 166 Wash. 691, 8 P. (2d) 421, as sustaining authority, counsel for appellant contend that this is an action at law and the verdict of the jury is binding upon the court.

Clearly, this action is one for the reformation, and recovery thereon as so reformed, of a burglary insurance policy on a safe.

In appellant's complaint is the following prayer that the contract of insurance be reformed so that its terms will be the same as agreed upon prior to its issuance, which terms are specifically detailed in the complaint and materially differ from the terms in the policy:

". . . without waiving the contention that defendant is estopped to deny plaintiff's right to recover in accordance with the contract between plaintiff and defendant, plaintiff prays that said mercantile safe burglary insurance policy No. BS 3277 be reformed so as to insure plaintiff, against loss . . . , inside or outside of any chest in the safe of plaintiff, . . ."

When the court inquired whether appellant was seeking to have the policy reformed so as to insure against loss for moneys inside or outside the chest in the safe, counsel for appellant stated the prayer of the complaint answered the question, and that:

"Certainly, we are asking for a reformation. Reformation is incidental to this suit, and not primary."

In the fourth paragraph of the complaint, it is alleged that the binder was delivered in accordance with the agreement of the parties and effectuated temporary insurance pending the issuance and delivery of the policy, which policy did not correctly state the contract between the parties. Patently, in the absence of events and conditions which, under the terms of the policy, must occur and exist in order to obligate the insurance company to pay loss, appellant could not recover under the policy as written.

When recovery cannot be had under the policy as written (and, surely, it cannot in the case at bar), and the assured claims, as in the case at bar, that the policy does not state the true contract and seeks to recover on the policy, praying that it be so reformed, reformation is the only relief asked, and the only relief possible. *Charada Inv. Co. v. Trinity Universal Ins. Co.,* 188 Wash. 325, 62 P. (2d) 722.

In *Gattavara v. General Ins. Co.,* 166 Wash. 691, 8 P. (2d) 421, like the other cases involving estoppel, the insured was entitled to recover under the policy as written. In such cases, the insurance company de-

fended on the ground that the policy was void for breach of some condition or warranty. No such situation obtains in the case at bar. The respondent does not seek to void the policy for breach of any condition or for any other reason. This is a case in which the insured seeks to extend the coverage of the policy. That can be done only by reformation.

One may not, by invoking the doctrine of estoppel or waiver, bring into existence a contract not made by the parties and create a liability contrary to the express provisions of the contract the parties did make. The general rule is that, while an insurer may be estopped, by its conduct or its knowledge or by statute, from insisting upon a forfeiture of a policy, yet under no conditions can the coverage or restrictions on the coverage be extended by the doctrine of waiver or estoppel.

The sole question presented was an equitable one; therefore, the verdict of the jury is in no way conclusive, it is merely advisory.

Conceding, *arguendo*, that this is a suit in equity, counsel for appellant insist that the trial *de novo* in this court should result in remand of the cause to the superior court, with direction to enter judgment in accord with the prayer of appellant's complaint. Some argument is made that reformation is unnecessary—that this action is based on an oral agreement of the parties and not on the policy.

The rules of law governing the reformation of written agreements are applicable to the reformation of an insurance policy. An insurance contract is no different from any other contract, when the rules of law governing the reformation of written agreements are to be applied to it. *Bjorklund v. Continental Casualty Co., 161* Wash. 340, 297 Pac. 155. It is a rule so well-settled as to need no citation of sustaining authority

that a written instrument, which constitutes the contract between two parties, will be reformed only when fraud or mistake is shown by clear, cogent, and convincing evidence. If, as in the case at bar, the evidence is in sharp conflict or any doubt exists as to the intent of the parties, reformation will not be granted.

■ The contention that reformation is not necessary, inasmuch as the action is not based on the policy, but on an alleged oral agreement between the parties, is without substantial merit. The action is one for reformation of the contract. All prior negotiations and representations were merged in the written agreement, and no action can be maintained upon any such preliminary agreement, as that asserted by appellant, as long as the final contract stands unchallenged and unreformed.

''The legal effect of a subsequent contract covering the same subject matter and made by the same parties as an earlier agreement, but containing terms inconsistent therewith, so that the two ˙cannot stand together, is to rescind the earlier contract. It becomes a substitute therefor, and is the only agreement between the parties upon the subject.'' *Sherman v. Sweeny,* 29 Wash. 321, 328, 69 Pac. 1117 (1902); *Legal Adjustment Bureau v. West Coast Const. Co.,* 162 Wash. 260, 298 Pac. 429 (1931).

See, also, *McGregor v. First Farmers-Merchants Bank,* 180 Wash. 440, 40 P. (2d) 144.

■ Surely, appellant is not basing its action on an alleged oral contract or upon the binder which, on its face, is void, upon issuance of a policy, or in ten days in any event. ''The term of this Binder shall end at twelve and one minute o'clock A. M. of the tenth day following that upon which the Binder takes effect.''

In *Lundman v. United States Fidelity & Guaranty Co.,* 163 Minn. 303, 204 N. W. 159, the insurance company's agent agreed to insure the plaintiff's safe for

burglary by forcible entry or otherwise. The policy, which was issued, later covered only forcible entry, and the loss for which suit was brought did not so occur. The plaintiff in the case cited endeavored to sue on the oral agreement. The court said:

"Plaintiff says he casually looked at it and placed it in the safe, but did not read it through. . . . The theory of recovery is this: There was an oral contract of insurance effective when made which covered this loss, and such contract was not modified or in the least affected by the delivery of a policy not known by the assured to exclude risks covered by the oral contract. On the trial and here plaintiff plants himself solely upon the oral contract, openly announcing that he does not seek or desire a reformation of the policy. . . .

"Contracting orally with the understanding that a subsequent written or printed version thereof will be executed or delivered, means that the parties are bound by the terms of the written or printed instrument designed to be the final consummation and accurate expression of the oral temporary agreement. In the instant case plaintiff admitted that a policy was to issue. It was issued and delivered to him within two months of January 31, 1923. He accepted and retained it. That became the sole contract between the parties. . . . But now the practice seems well established that the insured may bring an action to reform the policy and to recover on a loss under it as reformed. *Spurr v. Home Ins. Co.*, 40 Minn. 424, 42 N. W. 206; *Kelly v. Citizens' Mut. Fire Ass'n*, 96 Minn. 477, 105 N. W. 675; *Mahoney v. Minn. F. Mut. Ins. Co.*, 136 Minn. 34, 161 N. W. 217. But where the oral contract has been superseded by a written policy, the policy cannot be ignored. And, if a recovery is sought for property covered by the policy, the pleading and proof must show a right to recover under its terms or else under terms to which the insured is entitled to have the policy reformed or corrected. Well understood rules in equity determine whether reformation may be had. . . . There can be no fair doubt but that both parties considered the

oral contract made on January 31, 1923, was to be embodied or expressed in a policy thereafter to be issued by defendant, and which was in fact so issued and delivered to and retained by plaintiff. That must be presumed the contract whose terms may not be varied unless reformation thereof may be had under proper pleading and proof.''

It cannot be gainsaid that the parties at all times planned to have their final agreement stated in the policy which was issued. It follows that no suit can be had on any prior oral negotiations or upon the binder which expired by its own terms not later than ten days after issuance. If the true agreement was expressed in the oral contract or in the binder, and either varies from the written contract, the only remedy, we repeat, is reformation of the written contract to make it conform to the true intent of the parties.

The appellant has not shown by clear, cogent and convincing testimony that there was mistake or fraud in the issuance of the policy requiring the reformation of that contract. The trial court was in a better position than we to determine the credibility of the witnesses. The testimony was conflicting. In granting the motion for judgment *non obstante veredicto* and in entering the judgment of dismissal, there can be no conclusion other than that the trial court was of the view that mistake or fraud was not shown. We have uniformly held, in cases such as the one at bar, that, unless it be made to clearly appear that the evidence preponderates against the trial court's conclusions— the evidence does not so preponderate in this case —we will not disturb the finding or judgment of the trial court.

It fairly appears that all of the steps of the transaction in this case were handled through or with the

340

agents of the appellant who were conversant with all the facts in the matter of classification and rates, were familiar with insurance contracts, discussed with Mr. Shaw, appellant's vice-president, the coverage on this particular safe, and knew what coverage appellant desired and expected to receive. The most casual examination by Lambuth, who was appellant's agent and who discussed the policy and coverages with appellant's vice-president, would have revealed to that agent the coverage afforded by the policy. That agent is charged with that knowledge, and such knowledge is the knowledge of the appellant.

On October 10, 1934, Lambuth sent the policy to Shaw, who manually handled the policy and retained it in his possession. He testified, however, that he did not read it. The coverage is typed in a conspicuous place on page three of the policy. The endorsements now attached to the policy were not then on the policy. Our examination of the policy shows that opening the first sheet, which would be pages one and two, would disclose the coverage. To ascertain the amount of coverage, the term of the policy, the effective date, the amount of the premium, one would be required to look at the portion of the policy wherein is stated and defined the coverage. Shaw, appellant's vice-president, and two of appellant's agents saw the policy, handled the policy, and were under a duty to examine that policy. Not one of the three ever questioned the coverage afforded by it. More than a year passed. The first and second premiums were paid on the policy. Shaw asked for a temporary increase in coverage. This was ordered through Roach, of Lamping & Company, in 1935. The endorsement making the increase passed through the same channel as the policy.

Even if we did not agree with the trial court that

the policy truly reflects the quotation made to Shaw, the negligence of appellant would defeat its action for reformation. Appellant is presumed and is required to know the provisions of the insurance contract, as it would any other written contract into which it enters. It will not do for appellant's vice-president to say that he did not read the policy. Whether he or any of the other officers or agents of appellant read the policy, is immaterial. It was appellant's duty to read the policy, and the law says that that was done. *Hubenthal v. Spokane & Inland R. Co.,* 43 Wash. 677, 86 Pac. 955; *Hayes v. Automobile Ins. Exchange,* 126 Wash. 487, 218 Pac. 252; *Perry v. Continental Ins. Co.,* 178 Wash. 24, 33 P. (2d) 661; *McCann v. Reeder,* 178 Wash. 126, 34 P. (2d) 461; *Kelley v. Von Herberg,* 184 Wash. 165, 50 P. (2d) 23.

The binder affords no excuse to the appellant for failure to examine the policy. It provided coverage for only ten days, and specifies that issuance of a policy shall void the binder. The binder was issued for broad but temporary coverage to protect appellant until the insurance was finally agreed upon and a policy issued. When the policy was ordered, it was on the quotation already made of $3.82½ per thousand per annum and it confined the coverage to the chest alone. On the issuance of that policy, the binder became void. Its purpose, as disclosed by the testimony, was to provide temporary insurance pending an inquiry by the insurer as to the character of the risk and to take the place of a policy until same can be issued. It is, as stated in *Norwich Union Fire Ins. Society v. Dalton,* 175 S. W. (Tex. Civ. App.) 459,

". . . temporary in its nature, intended to take the place of an ordinary policy until the same can be issued. It is a short method of issuing a temporary

policy for the convenience of all parties, to continue, unless sooner canceled, until the execution of a formal policy. . . ."

The following remarks of the court of appeals of New York in *Sherri v. National Surety Co.*, 243 N. Y. 266, 153 N. E. 70, in passing on a question involving a binder, are apt:

"The term 'corrected policy' had this meaning and significance. At the time of the issuance of the binder insuring the property which is given immediately upon the application of the placer, the insurer knows little or nothing of the risk. Any and all investigation as to its nature and soundness has to be made thereafter. Should the risk prove to be hazardous, the company may cancel the insurance. When the policy is thereafter issued it is accompanied by certain declarations annexed thereto which are supposed to be the answers to questions made by the insured. The fact is that the company issuing the policy writes in these answers as it understands the facts to be. After the receipt of the policy by the broker for the insured, if any of these answers are incorrect or inaccurate, the insurer is notified and a corrected policy is issued. . . .

"These insurance binders, so called, have been before this court in other decisions. In *Lipman v. Niagara Fire Ins. Co.* (121 N. Y. 454) it was held that these binding slips are a present insurance in the amount specified; that they are a short method of issuing a temporary policy for the convenience of all parties to continue until the execution of the formal one. The obligations, however, of the parties are 'according to the terms of the policy in ordinary use by the company.' . . .

"One other consideration may be necessary. When the policy was delivered to the broker, it was supposed to examine it and return it for correction or for a corrected policy within a reasonable time. The binder was only to continue until the corrected policy was issued. The broker, therefore, could not keep the

binder alive by failing to do its work; that is, accept the policy as it was, or demand a corrected policy.''

The binder is at variance with the true agreement between the parties. It was executed prior to the time of any agreement between the parties, and at a time when there was merely an offer by the respondent, which had not yet been accepted by the appellant. It fairly appears that that offer was for exactly the coverage which the policy afforded. We agree with counsel for respondent that the binder can be of no assistance to us in determination of the question of whether the appellant is entitled to the reformation which it seeks.

The judgment is affirmed.

ROBINSON, MAIN, BLAKE, and GERAGHTY, JJ., concur.

[1]Reported in 65 P. (2d) 397.