[No. 29600.   Department Two.   July 20, 1945.]

DORA M. HESSELTINE *et al., Appellants,* v. THE FIRST
METHODIST CHURCH OF VANCOUVER, WASHINGTON,
*et al., Respondents.*[1]

[1]Reported in 161 P. (2d) 157.

*William L. Josslin* and *McMullen & Snider* (*Loren Grinstead* and *Arthur Grunbaum,* of counsel), for appellants.

*Schaefer & Hall* (*Louis Schaefer,* of counsel), for respondents.

BLAKE, J.—This is an appeal from a judgment dismissing an action seeking the cancellation of a trust deed executed by plaintiff Dora M. Hesseltine and her deceased husband, Roy Hesseltine. Plaintiff Marjorie K. Wallich is their daughter and the administratrix of the latter's estate.

The deed was executed April 25, 1938. By it, the grantors conveyed to

" . . . C. L. Firestone (LaVerne Firestone), Robert A. Hidden and Samuel G. Kern, as trustees and in trust, . . . [certain real estate in Vancouver], but reserving and excepting therefrom an estate for and during the life of these grantors and the survivor of them, but nevertheless subject to the terms, conditions and purposes of the trust hereinafter recited. The trustees shall have full power over the premises above described except the right to mortgage or convey the same but in all other respects their control shall not be impaired and they shall have all rights in said lands as we ourselves have at this time."

The beneficiaries of the trust created under the terms of the deed were Marjorie K. Wallich and the First Methodist Episcopal Church of Vancouver. Upon the death of "the survivor" of the grantors, the trustees were directed to pay one tenth of the net income from the trust property to "the proper officials of the First Methodist Episcopal Church . . . for the general purposes of said church or for its current expenses. All the rest of said net income and being the remaining ninety percent (90%) thereof, shall be paid by said trustees to our daughter, Marjorie K. Wallich, until such time as the latter herself has died." Upon her death, the trustees were directed to "convey full title in the described premises to the First Methodist Episcopal Church of Vancouver."

Appellants have made numerous assignments of error, which, as we view them, however, raise but four questions requiring discussion: (1) Whether the judgment of dismissal is warranted by the evidence; (2) whether the trust deed was rendered invalid by reason of a community property agreement entered into by Mr. and Mrs. Hesseltine in 1921, pursuant to the provisions of Rem. Rev. Stat., § 6894 [P.P.C. § 434-39]; (3) whether the trust deed amounted to an attempt to make testamentary disposition of the property; and (4) whether, by reason of the inhibition of Rem. Rev. Stat., § 1211 [P.P.C. § 38-3], Mrs. Wallich was disqualified from testifying as to conversations had with her father concerning the subject matter of the trust estate.

*First.* Hesseltine, at the time the trust deed was executed, and thereafter until his death in 1943, was treasurer of the First Methodist Episcopal Church. He had been an active and successful businessman all his life. Much of his business career had been devoted to banking, and, during the period with which we are concerned, although past seventy, he was actively engaged in carrying on an insurance business. He was loan agent for a large, nationally-known life insurance company, and he was also a member of the board of trustees of a savings and loan association, by which he was regularly engaged to appraise real estate values for prospective loans.

For some time prior to the execution of the trust deed, Hesseltine had been suffering from prostatic trouble, to correct which he had made arrangements to undergo an operation. On the date the deed was executed, Mrs. Hesseltine telephoned William Bates, an attorney and associate on the board of trustees of the savings and loan association of which Hesseltine was a member, and "told him Mr. Hesseltine was sick and [would] like to have him come down and *fix some papers.*" (Italics ours.) Bates, very shortly, went to the Hesseltine home. As to what occurred there, he testified as follows:

"Q. Who was present when you called? A. My conversation was exclusively with Mr. and Mrs. Hesseltine. They were there in the room. . . . Q. And was Mrs. Hessel-

tine in the room when you came into the room? A. She was in the room and sat in her rocking chair. Q. Did Mr. Hesseltine discuss a business matter with you? A. He discussed the drawing of this deed. Q. What did he say to you about the drawing of this deed? A. Mr. Hesseltine told me that he wanted this property deeded eventually to the church. He was treasurer at that time, I believe, of the church and he wanted the life estate for himself and his wife and the survivor, and then he wanted it to go to the— to be handled by the trustees of the church and they were to take care of the property. They were to take 10% for their services, that is of the net income, and they were to pay Marjorie Wallich 90% of that income until she dies and then the church should have full control. Q. Is that what he told you at the time? A. That is what he told me.

"Q. Was Mrs. Hesseltine then in the room? A. He sat on the bed and I sat where I could face him, and Mrs. Hesseltine—in other words, they were on each side of me, as it were. Q. Was she close enough so that she could hear what Mr. Hesseltine said? A. Oh, yes. No question about that. Q. Did he call the instrument that he wanted a deed or a will? A. He called it a deed. Q. Then what did you do? A. Well, then I wanted to know the name of the church because I was concerned as to whether it was a corporation or what, and he gave me that information. I also wanted to know the description of the property and he gave me the description of the property. I asked who the trustees were. He gave me the names of the three trustees. I asked if he was certain about it and he said yes. Q. Did you draw the deed then? A. I went up and took the notes, then I returned to the office. This was early in the afternoon, April 25, 1938, the date of the deed, whichever that is. I went back to the office and I dictated the deed and after the girl got through I again went up to the house and we assumed the same positions with relation to each other and the deed was given to Mr. Hesseltine and he read the deed. The deed was then given to Mrs. Hesseltine and she read it. I asked if they understood and if that was what they wanted and they said yes. They both signed it in my presence. I asked if they did this of their own free will and accord, using the phraseology of it, and they said yes, and I affixed my seal to it.

"Q. What happened to the deed after you had it signed by Mr. Hesseltine and Mrs. Hesseltine? A. In the presence of Mrs. Hesseltine he said, 'I want this to go to the church, and I want you to take it for them.' I said, 'I take no deed

unless there is legal delivery of it at this moment, and I will not take that deed unless there is a delivery to the trustees, and you can't recall it and you lose all control over it.' And they both assented to that. I said under that condition I would take the deed for delivery to these grantees to be put at record any time, and that was agreeable to both of them. I took the deed back to the office and kept it."

Bates held the deed until after Hesseltine's death in 1943, when he delivered it to the pastor of the church directly after the funeral services.

A real estate broker testified that he asked Hesseltine a short time after he, Hesseltine, got out of the hospital if he wanted to sell his property (the subject of the trust deed). He replied, "It is not mine to sell."

Witnesses for appellants testified as to conversations with Hesseltine in which he talked about selling the property in a manner that indicated he considered that he owned it in fee simple.

In attacking the judgment of dismissal, appellants charge that the court ignored the testimony of their witnesses and failed to appraise their evidence at its proper worth. They contend that a constructive fraud was perpetrated upon the Hesseltines, and that the evidence is insufficient to establish the fact of *delivery* of the deed.

We think the charge that the court ignored any testimony is without foundation. On the contrary, the court, in a memorandum opinion, made a comprehensive analysis of the testimony of the various witnesses and, we think, applied a correct evaluation to the testimony of each. Nor do we think there is any ground for believing that there was constructive fraud either in connection with the execution or the delivery of the trust deed.

■■ The insinuation of fraud in connection with the execution of the deed rests upon very uncertain statements found in Mrs. Hesseltine's testimony, to the effect that they thought they were executing a will. Aside from Bate's testimony to the contrary and the inherent improbability of any misapprehension as to the character of the instrument, neither Mrs. Hesseltine nor Mrs. Wallich, as admin-

istratrix of his estate, will be heard to say that the grantors did not know the contents or legal effect of the instrument.

Persons who sign an instrument will not be heard to plead ignorance of its contents if they had an opportunity to read it and the capacity to understand it. *Hubenthal v. Spokane & I. R. Co.,* 43 Wash. 677, 86 Pac. 955; *Carew, Shaw & Bernasconi v. General Cas. Co.,* 189 Wash. 329, 65 P. (2d) 689. Appellants' evidence falls far short of establishing that either of the grantors was in such a perturbed state of mind as to be incapable of understanding the contents and character of the instrument.

The inference of fraud in delivery of the instrument is drawn from evidence so tenuous that it could hardly be convincing to the most suspicious mind.

As we have said, Hesseltine, at the time the trust deed was executed, and until his death, was treasurer of the church board. Robert A. Hidden, one of the trustees named in the deed, was secretary. While Hesseltine was on his death bed—a day or two before the end—Hidden went to the Hesseltine home and, with Mrs. Hesseltine's consent, took from a safe where Hesseltine kept his documents an envelope which, admittedly, contained papers, such as bonds and bank books, that belonged to the church. C. L. Firestone, another trustee named in the deed, and a member of the board of trustees of the church, testified:

"Q. You were named as one of the trustees in the deed of April 25, 1938? A. That is right. Q. When did you first learn about that deed? A. Sometime in the summer of 1938. Q. What were the circumstances? A. Mr. Hesseltine came to my place and showed me what I suppose was a copy of the deed. I have no way of knowing what it was otherwise than it had the same wording. Q. Was it the actual deed or a copy? A. I said I had no way of knowing whether it was the actual deed or a copy.

"Q. I hand you Plaintiff's Exhibit 2, being the deed dated April 25, 1938, and ask you if that was the deed that Mr. Hesseltine showed to you in the summer of 1938? Look it over carefully. A. I believe your question is whether this is the identical paper he handed me? Q. We are asking you—this is Plaintiff's Exhibit 2, this would be the paper here, right here. Would you please look that over

and see if that was the paper that Mr. Hesseltine showed you in the summer of 1938? A. I couldn't answer that because—without reading this through. It apparently is the same wording as at that time. Whether it is the actual paper I couldn't answer. Q. Were the papers that you saw in 1938, did you notice whether or not there was—there were signatures on it in ink? A. There were signatures on it in ink, yes."

There is an absence of evidence that any *copy* of the instrument was signed by the grantors and retained by them.

From these facts, appellants would have us infer that the Hesseltines had retained possession of the deed of trust and that it was in the envelope containing church papers which Mr. Hidden took from Hesseltine's safe while the latter was in the throes of death. The argument necessitates the further inference that Hidden gave the deed to Bates and Bates delivered it to the pastor of the church immediately after the latter had conducted funeral services over Hesseltine's body.

Of this imputation of fraud in the delivery of the trust deed, the trial court said:

"One undisputed fact is that Mr. Bates had the deed in his safe and the question arises how did he get it if not in the manner he says he did. Certainly he did not get it through Robert Hidden. Mr. Hidden was not a reluctant witness as counsel for plaintiffs suggests. He came to the stand and testified readily in answer to all questions. His manner was frank and he had no personal interest in the action whatever. It is inconceivable that he should have abstracted the deed from Mr. Hesseltine's papers without authority and that Mr. Bates should be a party to the illegal delivery. They are both men of excellent reputation for veracity and, having no interest in the result of the action, can not be thought to have deliberately testified to falsehoods."

Needless to say, we agree with the trial court's appraisal of the evidence.

■ *Second.* February 19, 1921, pursuant to the provisions of Rem. Rev. Stat., § 6894, Mr. and Mrs. Hesseltine entered into a community property agreement providing

that, upon the death of either, the title to "the whole of said community property now owned by them or which may hereafter be acquired by them, shall at once vest" in the survivor.

Appellants contend that such an agreement restricts the alienation of any real property of which the community may be seized at the time it is executed. In other words, the only way real property may be alienated after such an agreement is entered into is by modification of the agreement itself. Recognizing the difficulties of their position, appellants admit that, in case community property be sold for a valuable consideration, the purchaser would acquire title "by estoppel."

We think the position of appellants is untenable. The statute is not designed to vest a separate estate in community property in either spouse before the death of the other. That may be accomplished by deed or gift. Construing the statute in *Bartlett v. Bartlett*, 183 Wash. 278, 48 P. (2d) 560, we said, p. 282:

"The purpose of this statute is to enable husbands and wives to enter into agreements concerning the status and disposition of their *community* property, owned by them at the time or subsequently acquired by them, the agreement to take effect upon the death of *either* husband or wife. Such agreements are twofold in nature, contractual and testamentary. The statute with reference to such agreements permits the husband and wife to contract as to how their community property shall be disposed of and also *provides the specific point of time at which such agreement respecting status and disposition shall take effect.*" (Italics ours.)

And in this case, as in that, p. 282:

"The purpose was, and the agreement specifically so states, that, upon the death of either, the entire community property should vest in the other *in fee simple.*"

Clearly, there is nothing in the community property agreement which restricts the alienation of community real property by deed properly executed by both members of the community.

■ *Third.* The contention that the trust deed is but an attempt to make testamentary disposition of the property is also without substance. By its express terms, the trust deed vests in the trustees

" . . . full power over the premises above described except the right to mortgage or convey the same but in all other respects their control shall not be impaired and they shall have all rights in said lands as we ourselves have at this time."

Plainly, the deed vests the trustees with a fee-simple estate, subject only to the life estates of the grantors and their daughter. Delivery of the deed having been established, the gift was complete. *In re Cunningham's Estate,* 19 Wn. (2d) 589, 143 P. (2d) 852. Such was not the case in *In re Murphy's Estate,* 193 Wash. 400, 75 P. (2d) 916, upon which appellants chiefly rely in support of their contention that the trust deed is but an attempt to make testamentary disposition of the property.

■■ But, say appellants, the trustees did not exercise any dominion over the trust estate; that the trust became, therefore, a dry, or passive, trust, and, under the statute of uses, the estate vested immediately in the beneficiaries.

We do not think trustees, by failure to exercise their powers, can transform an active trust into a passive one. In any event, the statute of uses cannot be invoked because the trustees' title is subject to the contingent estate of Mrs. Wallich. 27 Am. & Eng. Enc. of Law 107.

*Fourth.* Proffers of proof were made while Mrs. Wallich was on the witness stand of certain conversations she had with her father concerning the subject matter of the trust. These proffers were rejected on the ground that, in view of the inhibitions contained in Rem. Rev. Stat., § 1211, Mrs. Wallich was not competent to testify to such conversations.

It is unnecessary to determine whether Mrs. Wallich, in view of the inhibitions of § 1211, was competent to testify with respect to conversations had with her father, for, treating the proffers of proof as testimony and according them all possible weight, they are, to our minds, insufficient

to change the result reached by the trial court, with which we are in complete agreement.

Judgment affirmed.

BEALS, C. J., ROBINSON, STEINERT, and MALLERY, JJ., concur.

September 27, 1945. Petition for rehearing denied.